**Versie KIMBLE, Plaintiff-Appellee,**

v.

**NOBLE DRILLING CORPORATION et al., Defendants-Appellants.**

**No. 26357.**

United States Court of Appeals Fifth Circuit.

Sept. 23, 1969.

Rehearing Denied Nov. 4, 1969.

**848**

George V. Baus, Adams & Reese, New Orleans, La., for defendants-appellants.

Donald V. Organ, New Orleans, La., for plaintiff-appellee.

Before THORNBERRY and DYER, Circuit Judges, and FISHER, District Judge.

THORNBERRY, Circuit Judge:

The main question presented by this admiralty appeal is whether appellee Versie Kimble could properly be found to have been a seaman for purposes of the Jones Act and general maritime law at the time of his injuries. Kimble was injured twice while in the employ of Noble Drilling Company, both times while working on stationary drilling platforms at sea, and in both instances the jury found that he was a seaman and that Noble's negligence had contributed to his injuries. It also found that negligence of appellant Chevron Oil Company was a proximate cause of one of the accidents. In accordance with the jury's verdict, the trial court rendered judgment for appellee Kimble against Noble under the Jones Act and against Chevron under the general maritime law,[1] overruling appellant's motions for directed verdict and for judgment notwithstanding the verdict. We affirm.

Chevron Oil Company conducts large offshore oil recovery operations in the Gulf of Mexico for which it hires a number of independent contractors. It owned the two drilling platforms at issue here, platforms "G" and "H," together with their tenders the S–24 and the S–26, both of which were converted LST's. The drilling platforms were permanent, immobile artificial islands affixed to the ocean floor, but the tenders, although they remained adjacent to the platforms for the most part, were mobile vessels that could be shifted from platform to platform or taken into open sea in rough weather.

At the time of his first injury, appellee Kimble worked as a "driller" for Noble Drilling Company, which owned the drilling rigs on the platform and had been hired by Chevron to perform the actual drilling operation. As a driller, Kimble was in charge of one of the four-man crews that worked in alternating shifts on the platform. Thus he did most of his work on the platform, but there is considerable evidence in the record to support Kimble's claim that he also had

---

1. Kimble's theory of recovery from Chevron is not entirely clear. At one point, he states that Chevron's liability under general maritime law does not depend upon his status as a seaman, a claim that, upon its face, would seem to imply that liability rested in some manner upon categorizing the stationary platforms upon which the accidents happened as "vessels." This argument, however, is foreclosed by the recent decision of the Supreme Court in Rodrigue v. Aetna Casualty & Surety Co., 1969, 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360. Therefore, we hold that Chevron's liability under general maritime law can rest only upon the jury's finding that Kimble was a seaman, which finding meant that he was entitled to recover against Chevron as the owner of the ship.

substantial duties on board the tender. In particular, he had responsibility for making sure that the drilling mud, which was pumped from the mud room on the vessel, was properly mixed. As ancillary duties, therefore, he was charged with maintenance of the mud room equipment and mud pumps, with training and supervising his crew, with maintaining pipes, and with helping in connecting and disconnecting lines from the vessel to the platform when the vessel was moved. Moreover, his activities were always closely related to activity on the vessel, which served as a supply, personnel, equipment, fuel and command center for the entire drilling operation. A part of the reason for his first injury, for example, seems to have been the absence of necessary tools, which he had sent a member of his crew to fetch from the tool room on the vessel.

In addition, during his tour of duty, which was ten days long followed by five days off, Kimble was assigned a permanent room on board the vessel; he ate and slept aboard. While on board, he was subject to the discipline of the master of the ship and underwent many of the same hazards of the sea to which other members of the crew were subjected. There is even some evidence that he was required on occasion to perform tasks that a more traditional blue-water seaman might be expected to perform, although these were probably rare.

At the time of Kimble's second injury, he was a member of a floor crew rather than a driller, and his responsibilities with respect to the mud operation were somewhat reduced. But numerous incidents of the relation of his employment to the vessel remained.

■ It is to be remembered that our question here is not whether these facts, of themselves, constitute Kimble a seaman, but rather whether they support a jury finding that he is one. This question is largely controlled by Noble Drilling Corp. v. Smith, 5th Cir. 1969, 412 F.2d 952, in which a jury award to an employee of the same drilling company involved here was upheld. The plaintiff in that case was injured while working on a drilling platform, but the Court upheld a jury finding that he was a seaman because his duties included handling mud and mud pumps on a tender and because he was assigned a permanent place on board ship. This result in the *Smith* case followed from the decision of this Court in Offshore Co. v. Robison, 5th Cir. 1959, 266 F.2d 769, 779, 75 A.L.R.2d 1296, which established the following test for a case sufficient to go to the jury:

> [T]here is an evidentiary basis for a Jones Act case to go to the jury: (1) if there is evidence that the injured workman was assigned permanently to a vessel (including special purpose structures not usually employed as a means of transport by water but designed to float on water) or performed a substantial part of his work on the vessel; and (2) if the capacity in which he was employed or the duties which he performed contributed to the function of the vessel or to the accomplishment of its mission, or to the operation or welfare of the vessel in terms of its maintenance during its movement or during anchorage for its future trips.

Under this test, coverage of the Jones Act has been extended to a wide variety of ships' personnel not traditionally thought of as seamen but subject, as are seamen, to the negligence hazards with which the Jones Act was intended to deal. The case at bar clearly falls within the province of the jury because (1) there is undoubtedly some evidence that Kimble was assigned permanently to the vessel tending the platform on which he worked in each instance and (2) there is ample evidence that the duties Kimble performed contributed to the function and mission of the tender, since its sole reason for existence was to support the platform in drilling for oil.

Appellants advance several arguments by which they seek to avoid liability. First, they assert that there is no evi-

dence from which the jury could have found negligence on the part of either Noble or Chevron; but we have read the record carefully and find that this contention is without merit. Secondly, they argue that Freeman v. Aetna Casualty & Surety Co., 5th Cir., 1968, 398 F.2d 808, requires us to exclude oil platform workers from Jones Act coverage. *Freeman* is indeed a case in which an oil platform worker was denied the protection of the Jones Act, but the trouble with appellant's argument is that the trial court in *Freeman* did exactly what appellants ask us not to permit here: It submitted the question to the jury, and it was the jury that denied the plaintiff status as a seaman.

■ In a final attempt to avoid liability, appellants argue correctly that the drilling platforms on which Kimble was injured were not vessels but artificial islands. As such, appellants argue, the platforms are governed not by admiralty but by the law of the adjacent State of Louisiana, which is "borrowed" as federal law on these structures by the Outer Continental Shelf Lands Act, 67 Stat. 462, 43 U.S.C. § 1331 et seq. (1964). This issue has in fact been decided exactly as appellants urge in Rodrigue v. Aetna Casualty & Surety Co., 1969, 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360, but that decision does not help their case. The Outer Continental Shelf Lands Act does not oust admiralty law having a basis of applicability independent from the location of the platforms at sea; indeed, it specifically provides that the general law of the upland state is made the applicable federal law *only to the extent* that it is "not inconsistent with * * * other Federal laws." In *Rodrigue*, the Supreme Court recognized this limitation. It simply reversed a holding that the Death on the High Seas Act applied to workmen on oil platforms at sea because "the Seas Act does not apply of its own force under admiralty principles" to men working on land. The case at bar is distinguishable in that the Jones Act and the general maritime law do apply of their own force here;

they would still apply, in fact, even if we assumed that Kimble received his injuries in the heart of the Louisiana mainland, so long as he was acting at the time as a seaman in the service of his ship. See Central Gulf Steamship Corp. v. Sambula, 5th Cir. 1968, 405 F.2d 291, 299. Here, Kimble's status as a seaman depended not on the location of the platforms at sea but upon his assignment to, and responsibilities on, the tender, which was unquestionably a vessel.

Affirmed.