**Josephine WOLBERT, as Administratrix of the goods, chattels and credits of John G. Wolbert, deceased, Plaintiff,**

**v.**

**The CITY OF NEW YORK, Defendant.**

**No. 66 C 557.**

United States District Court,
E. D. New York.

June 26, 1970.

Martin P. Krimko, Brooklyn, N. Y., for plaintiff; Benjamin J. Sergi, Brooklyn, N. Y., of counsel.

J. Lee Rankin, New York City, for defendant; George A. Weiler, New York City, of counsel.

ABRUZZO, District Judge.

This case was tried before this court, without a jury, on November 10th, 12th, 13th, 18th, 26th and December 2, 1969, on the issue of liability only.

The deceased had been in the employ of the City of New York for some 16 years and was assigned to work as a "deckhand" in the Whitehall Terminal (where there are five ferry boat slips) on January 29, 1966, the date on which plaintiff claims the accident in question took place.

The accident in question occurred on slip no. 5 at a time when plaintiff's decedent was assisting in the tying-up of a ferry boat, the "John F. Kennedy," at about 8:30 P.M.; the "John F. Kennedy" was being tied up for the night.

Photographs in evidence, Plaintiff's Exhibit 1, and Plaintiff's Exhibit 7, indicate what plaintiff's decedent did to assist in tying-up this boat. He had to climb over a railing and then go out to what is known as a "rack" (Plaintiff's Exhibit 1). While he was on the "rack" he threw a line to a deckhand on the "John F. Kennedy" who tied that line to

a hawser and thereupon the deceased carried that hawser to the dock and secured the hawser so that the ferry boat could be docked and tied up.

This action was brought in admiralty pursuant to the Jones Act, 46 U.S.C. § 688. In other words, if he is not a seaman within the purview of the Jones Act, it is conceded that the plaintiff must be non-suited. A letter from plaintiff's attorney is self explanatory and reads as follows:

"SERGI AND FETELL

Attorneys At Law—Proctors in Admiralty
44 Court Street
Brooklyn, New York 11201

TRiangle 5–8808

June 9, 1970

Honorable Matthew T. Abruzzo
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, N.Y.

Re:    Wolbert v. The City of New York

Honorable Sir:

This is to reaffirm that the plaintiff, by his counsel, at the time of the institution of this suit, did not file a notice of claim against The City of New York, in compliance with the provisions of the Administrative Code of The City of New York and Section 50E of the General Municipal Law.

Defendant raises this point as a second, separate and distinct defense in its answer to plaintiff's complaint. Therefore, the plaintiff is relying wholly and solely for its liability of the defendant under the Jones Act and General Maritime Law.

Regarding the Court's inquiry of the compensation aspect, please be advised that the employer defendant, The City of New York, filed an employer's report of injury with the New York State Workmen's Compensation Board (see plaintiff's Exh. 5). However, no compensation benefits were paid, no determination was made.

Plaintiff, through his counsel, advised the Compensation Board that he was seeking a third party action against the defendant under the Jones Act and that the compensation claim should be suspended pending the determination of the third party action. No payments for compensation or maintenance and cure were made to plaintiff during his lifetime, nor to his widow since his demise.

Respectfully yours,

SERGI & FETELL

by Benjamin J. Sergi
Benjamin J. Sergi"

BJS:aw

The negligence claimed under the Jones Act is that the area the deceased worked in on the night of the accident was covered with snow and ice and there

had been no attempt to remove the snow and ice. He walked on some planking which, it is claimed, was covered with snow and ice and then had stepped on a rail or plank (Plaintiff's Exhibit 7) which was not only covered with snow and ice, but worn from many years of wear. He slipped and fell on his feet. He did not fall down. He went back to work the next day. That day he realized that his foot was getting discolored, there was a streak of blood in the toes, and he failed to go back to work again. It is conceded that the deceased had been a diabetic for some 15 years. Two days after the accident he went to the Marine Hospital on Staten Island. While in that hospital, they amputated toes and eventually during the 90 days he was there, they amputated the right leg below the knee. Nine months after he left the hospital he returned to the Marine Hospital and they amputated the left leg below the knee. About a year later he died and his wife was appointed Administratrix. Her action in the administratrix capacity is for conscious pain and suffering and that the accident was the cause of his death.

The question that must be treated first is whether or not the deceased comes within the purview of the Jones Act. The defendant contends that the Jones Act does not apply to this case. In order to reach a decision on that particular question, some of the testimony in plaintiff's case must necessarily be reviewed.

John Wolbert, deceased, in his deposition of September 21, 1967, read into evidence, stated as follows:

*Trial Transcript, page 38, line 16 to page 39, line 4*

"Q   By whom are you employed?

A   The City of New York, Department of Marine & Aviation.

Q   How long have you been employed by the City of New York?

A   16 years.

Q   Are you a Civil Service employee?

A   Yes.

Q   Did you take the examination?

A   Yes, sir.

Q   In what capacity are you employed?

A   As a deckhand."

*Trial Transcript, page 39, line 23 to page 40, line 4*

"MR. SEGI (sic):   Q   What are your duties as a deckhand?

A.   As a deckhand, I'm assigned to a vessel to load and unload passengers and cars and to act as lookout when ordered by the Captain."

*Trial Transcript, page 41, line 3 to page 43, line 23*

"MR. SEGI (sic):   Q   Now, when you entered upon your duties, were you assigned to the boat or any particular boat?

A   No, sir

Q   What was your assignment?

There are objections, it wasn't answered. I beg your pardon, the answer is, 'At the time I was employed, I was assigned to the dock.'

Q   16 years ago?

A   My very first assigned (sic) was at the dock at Whitehall.

Q   How long did you remain on the dock?

A   One day. The following day I was assigned to the boat.

Q   What name?

A   Gold Star Mother.

Q   How long did you work on that dock?

A   One day, I believe it was.

Q   What was your next assignment?

A   That I could not recollect.

Q   Did you recall whether you worked on the boat for the first two years?

A   Yes, I did, sir.

Q   Every day?

A   No, sir.

Q   Did you have any permanent assignment on a boat?

A   No, sir.

Q For the first five years, was the situation the same?

A Yes, sir.

Q How about for the first ten?

A The same.

Q The entire time you worked for the City it was the same situation?

A Yes.

Q Now, was there a time when you worked as a chauffeur?

A Yes, sir.

Q For how long were you a chauffeur?

A Five years.

Q For the Commissioner?

A For the Director of Ferry Operations.

Q What is his name?

A Captain McGuire, deceased.

Q Do you recall the years during which you worked as a chauffeur?

A Not offhand.

Q Approximately, can you tell me?

A From 1953, 1954, somewhere in that time.

Q Till about 1960?

A That would be it, 1959, 1960.

Q Now after 1960, what duties were you assigned?

A I was assigned to the dock.

Q Any particular dock?

A At St. George first and then transferred to Whitehall.

Q What were your duties on the dock?

A To load and unload passengers, to assist in docking of the boats and to standby to serve as a deckhand, if necessary, on the boat."

*Trial Transcript, page 45, line 5 to line 13*

"Q How many times had you worked on a vessel the two months preceding January 29, 1966?

A That I couldn't tell you. I don't keep records.

Q Would you know how many times you had worked on a vessel in the year preceding January 1966, January 29 1966?

A Ten times, fifteen times."

*Trial Transcript, page 77, line 17 to page 80, line 10*

"Q Did you have any duty on or about the ferry boat at slip 5 at approximately 8:45 P.M. on January 29, 1966?

A Not aboard the ferry, I was on the racks handling the lines for the ferry.

Q What was the name of the ferry boat?

A John F. Kennedy.

Q Just what did your duties consist of in handling the lines?

A Deckhand on the boat would hand the lines to me and I would have to secure them to the spiles in the rack.

Q Did you receive any order or instructions regarding your duties on January 29, 1966?

A In what way, sir?

Q Your attorney has asked me this question, therefore, I ask you, if you want me to elaborate I will be glad to do it.

The question was: Did you receive any order or instruction regarding your duties on this day?

A 8:30 in the evening I was ordered by the foreman to assist in tying up the ferry boat John F. Kennedy.

Q Did he tell you what to do?

A No sir.

Q You knew what to do?

A I take orders from the mate on the boat. I'm under the jurisdiction of the mate on the boat.

MR. WEILER: Objection.

THE COURT: I will allow it.

MR. SEGI (sic): Q Did the mate tell you what to do?

A He told me where to place the lines.

Q Anything else?

MR. WEILER: I move to strike it out because this action didn't occur at the time he was placing the lines. This occurred after he had returned.

THE COURT: I will allow it * * *.

MR. SEGI (sic): Q And immediately prior to your duties at slip 5 you were at slip 2?

A Yes sir.

Q What were your duties there?

A To load and unload the passengers from the upper terminal to the ferry boat.

Q You opened and closed the gate?

A The doors.

Q For how long a period of time had you been working at slip number 2?

A On that day?

Q No, prior to that day, for how long, how many months or years?

A I would not know. My assignment is where I'm assigned, that was my steady assignment, but the boat doesn't come in at the same slip all the time.

Q But that was your steady assignment for the past two years?

A Yes, sir."

* * * * * *

Rules and Regulations of the Department of Marine and Aviation of the City of New York, admitted into evidence as Plaintiff's Exhibit 4, on page 8 thereof, read in part as follows:

"Mater will instruct Deckhands in their duties and make sure they carry out their duties. The Mate shall instruct Deckhands detailed to the upper deck to stand by the gates and chains to guard against passengers passing until the foot bridge is down on the deck and the gates attached properly to the foot bridge. Before opening gates on main deck or saloon deck the Mater or Deckhand, whichever the case may be, must call out in a loud distinct voice, 'hands off gates, watch your step,' in order to prevent injury to passengers.

DUTIES OF DECKHANDS. Under close supervision to: operate gangplanks, regulate passenger traffic, load and unload freight, handle lines, act as lookout, clean boats, perform heavy manual labor in connection therewith, perform related work.

Deckhands will be required to keep that part of boat which they are assigned to clean. They must continuously patrol in such a manner as to maintain the seats clean and free from liquid stains, discarded papers and cups, etc., to keep the decks clean and free from accumulation of trash or discarded papers. Sweepings should be picked up immediately and be put into cans provided for that purpose. Under no circumstances are sweepings, etc. to be thrown overboard in violation of port rules. Filled cans will be disposed of in the manner directed and replacement obtained from deck.

Deckhands must stand their watch as above mentioned, under no circumstances are they to hide away in dugout, locker rooms or any other location. When the vessel is under way they should be alert to prevent smoking in unauthorized places; they should suppress disturbances; they should make sure no male enters the ladies room.

Deckhands must not fraternize with any passengers male or female, they are not allowed while on duty to be seated anywhere on seats allocated for passengers; this does not preclude Deckhands from answering any questions that passengers may ask, etc., or from being courteous as the case warrants.

Deckhands will station themselves at their docking stations in sufficient time as not to have to barge through the passengers already assembled there.

*Deckhands assigned to terminals will carry out the orders of the Terminal Supervisors.* (emphasis added)

The Deckhands must remain at their station of duty at all times and must

not leave at the end of his Tour without being properly relieved."

\*　\*　\*　\*　\*　\*

Robert Michelson, a deckhand on the ferry "John F. Kennedy," testified in part as follows:

*Trial Transcript, page 110, line 19 to page 111, line 16*

"Q On the day of this accident, Mr. Michelson, where were you working?

A On the boat.

Q That's the Kennedy; is that right?

A Yes, sir.

Q Who handed the lines to Mr. Wolbert from the Kennedy?

A I did.

Q Did you see him come out on the rack the way he came out on the rack?

A Yes, sir.

THE COURT: The way you put it on the photograph and the blue pencil?

A Yes, sir.

Q After he secured the line, did you see him go back?

A No, sir I was busy turning up.

Q When you got off the ferry boat did you see Mr. Wolbert at all?

A Yes, sir.

Q Where was he, what was he doing?

A Leaning against the rail."

\*　\*　.\*　\*　\*　\*

Mr. Michelson made a statement, a part of which was received in evidence as Plaintiff's Exhibit 8. The statement in evidence reads as follows:

"April 13, 1967

Interviewed by C. Doesberg at the office of the Corporation Counsel

RE: JOHN WOLBERT

ROBERT WILLIAM MICHELSON, 35 years, deckhand, (since 1963) 179 Castelton Avenue, Staten Island, tel 447–8040 states:

On a Saturday night in January 1966, I was on duty on the ferry J. F. KENNEDY. It was a cold night. There was snow on the racks. The ferry was being tied up on the No. 5 slip on the New York terminal. I was on the starboard side on the main deck. I passed the line to WOLBERT who was working on the No. 5 slip opposite me. I was about ten feet from WOLBERT. I did not see WOLBERT slip. Wolbert's duty was to drop the eye of the line on the piling. There was another man on the port side on the No. 5 slip doing the same work as Wolbert. His name is STANLEY.

\*　\*　\*　\*　\*　\*

(signed) Robert W. Michelson"

\*　\*　\*　\*　\*　\*

The plaintiff's interrogatories were answered in part as follows:

*Trial Transcript, page 91, line 15 to page 92, line 21*

"Question 6 of the interrogatories:

State whether or not the plaintiff had any duties on and about the ferry boat J. F. Kennedy at slip number 5 at approximately 8:45 P.M. on January 29, 1966, relating to the operation of the ferry.

A Six—yes.

Subparagraph (a) of the question:

What duties does the defendant claim the plaintiff had at slip number 5 at the aforesaid time and place, if any?

Answer (a): Duties were to raise or lower the bridge and help with lines.

Question 6 (b)

What duties did the plaintiff have, if any, in the fulfillment of his work as an employee of the defendant on January 29, 1966, prior to the time of his accident?

Answer 6 (b): The plaintiff was assigned to Whitehall terminal as an apron man or a bridge man on land.

Question 6 (c): Did the plaintiff receive any orders or instructions regarding his duties on January 29, 1966. If so, from whom did the plaintiff receive such orders or assignment thereof, and state the substance thereof.

Answer 6 (c): His duties were routine and automatic and namely, to

operate the bridge and assist with lines under the jurisdiction of the terminal foreman."

\* \* \* \* \* \*

Ferry Supervisor, William McDermott, testified in part as follows, in his examination before trial, in evidence.

*Trial Transcript, page 144, line 24 to page 145, line 12*

"Q Did there come a time on that day when you assigned him any specific duties with reference to the ferry boat J. F. Kennedy?

A Yes he was assigned to handle lines on the dock side of the tie-up.

Q Not speaking of that particular case but in general can you tell us what you mean when you say handle the lines on the dock side of the tie-up?

A Well, Mr. Wolbert would catch a heaving line which was attached to a three-inch hawser line, which he would bring up to the rack and tie it onto one of the pilings."

*Trial Transcript, page 146, lines 9 to 25*

"Q In the terminal itself do you have control of all the men who work at the terminal?

A Yes.

Q Can you tell us whether or not at the terminal you have employees who are classified or designated by different job titles or job ratings, or are they all rated the same?

A No, we have different titles on the dock.

Q What different titles do you have on the dock?

A We have deck hands, we have laborers and we have ticket agents.

Q Among the different ratings or capacities or job titles which you have just stated was Mr. Wolbert, the plaintiff, in any one of these job capacities?

A Mr. Wolbert was a deck hand."

*Trial Transcript, page 147, line 20 to page 149, line 7*

"Q Do you have any personal knowledge of the qualifications to be a deck hand?

A Yes.

Q What are they?

A Well, you must have previous experience.

Q As to what?

MR. WEILER: As what?

MR. SERGI: Q As what?

A As a deckhand, or a reasonable facsimile.

Q What else?

A You must be able to handle lines and you must pass an examination, a written examination, 100 questions true or false, and you must take a practical test in handling lines, tying knots, and a swimming test.

Page 11, line 11 [of Examination Before Trial]:

Q What did you tell us were deck-hands subject to perform aboard ferry boats?

A Their duty is open and shut the gates on the ferry, clean the ferry, handle lines, and in the event there was a suicide they would lower the small boat to relieve such a person.

MR. WEILER: I have it as 'retrieve' in my copy.

MR. SERGI: All right, I read it as it is.

MR. WEILER: I believe Mr. Lefkowitz also has 'retrieve.'

MR. LEFKOWITZ: It was crossed out and changed.

MR. SERGI: On page 13, line 16:

Q Mr. McDermott, do you know whether or not at approximately 8:45 P.M. on January 29, 1966 the ferry boat J. F. Kennedy was being tied up for the night?

A Yes, it was.

Q It was?

A Yes."

*Trial Transcript, page 152, line 22 to page 153, line 19*

"Q You never assigned a laborer to work aboard a ferry?

A No.

Q  When a deckhand was assigned aboard a ferry was he subject to perform the same duties aboard the ferry as any other deckhand who was regularly aboard the ferry?

MR. WEILER: Objection.

MR. SERGI: A  Yes.

THE COURT: No, I will take it.

MR. SERGI: Q  In the course of an operation such as Mr. Wolbert was engaged in on the evening of January 29 1966 was he under your supervision, subject to your orders or subject to the orders of the captain of the ferry?

A  You were speaking of the—

Q  Actual handling of the lines and tying them up.

A  He was under my supervision.

Q  Would you or the captain tell him where to put the line?

A  That would be the captain."

*Trial Transcript, page 155, line 13 to page 156, line 2*

"Q  When they worked under your supervision the deckhands and the laborers were substantially to perform the same duties, isn't that right?

A  Yes.

Q  Were there times when either one of those two job ratings would not be working under your supervision?

A  Yes.

Q  When would that occur?

A  If they were assigned to the ferry boat they would not be under my supervision.

Q  Could laborers be assigned to work on ferry boats or were there only deckhands?

A  Only deckhands."

*Trial Transcript, page 157, line 4 to line 14*

"Q  What duties were deckhands subject to perform aboard ferry boats?

A  Their duty is to open and shut the gates on the ferry, clean the ferry, handle lines and in the event there was a suicide they would lower the small boat to retrieve such a person.

And now continuing with material not read:

Q  When they perform those duties on a ferry boat under whose jurisdiction or authority would they be?

A  The captain."

\*   \*   \*   \*   \*   \*

## WAS PLAINTIFF'S DECEDENT A SEAMAN WITHIN THE MEANING OF THE JONES ACT

The Jones Act (Title 46 U.S.C. § 688) does not define the word "seaman."

In pertinent part that section states as follows:

"§ 688.  Recovery for injury or death of seaman

Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable.  \*   \*   \*"

The Supreme Court, in Desper v. Starved Rock Ferry Co., 342 U.S. 187, 190, 72 S.Ct. 216, 218, 96 L.Ed. 205, stated the following:

"The many cases turning upon the question whether an individual was a 'seaman' demonstrate that the matter depends largely on the facts of the particular case and the activity in which he was engaged at the time of injury.  The facts in this case are unique.  The work in which the decedent was engaged at the time of his death quite clearly was not that

usually done by a 'seaman.' \* \* \* To be sure, he was a probable navigator in the near future, but the law does not cover probable or expectant seamen but seamen in being. It is our conclusion that while engaged in such seasonal repair work Desper was not a 'seaman' within the purview of the Jones Act. \* \* \* In the words of the court in Antus v. Interocean S. S. Co. (C.A. 6th Cir.), 108 F.2d 185, 187, where it was held that one who had been a member of a ship's crew and was injured while preparing it for winter quarters could not maintain a Jones Act suit for his injuries: 'The fact that he had been, or expected in the future to be, a seaman does not render maritime work which was not maritime in its nature.' "

Prior to the *Desper* case *supra*, the Supreme Court in Swanson v. Marra Bros., Inc., 328 U.S. 1, 5, 66 S.Ct. 869, 90 L.Ed. 1045 (1946) stated:

"We have no occasion to consider here whether Congress, by the Jones Act, undertook to or could give a remedy against the employer for injuries caused by a vessel to his employees, not members of the crew of the vessel, while working on shore. For Congress, by later legislation, has expressed its purpose to restrict the liability of the employer under federal statutes to injuries to his employees occurring on navigable waters or inflicted upon an employee who is either a master or member of a crew of the vessel, injured in the course of his employment as such."

There is no hard and fast definition that this court can glean from the cases read as to what a "seaman" means in admiralty. Some of the factors here that must be taken into consideration are:

1. Not a member of the crew of any vessel;

2. No permanent assignment to a vessel;

3. No temporary assignment to a vessel at the time of the accident;

4. Assignment on land (ferry terminal);

5. Employment aboard ship for only a short period of time (7 to 13 days in 15 years);

6. Accident occurred on land;

7. Sleeping, eating and living ashore at all times;

8. Paid an hourly wage and worked an eight hour day; and

9. No seaman's papers.

This court has reviewed some other of the cases which are relevant to the facts in this case. They are as follows:

In Senko v. LaCrosse Dredging Corp., 352 U.S. 370, 77 S.Ct. 415, 1 L.Ed.2d 404 the court, reversing the State court in a case involving a petitioner who was employed by respondent in dredging operations on a dredge that was anchored to the shore at all times during the petitioner's employment and seldom in transit, held that there was sufficient evidence in the record to support the jury's finding that petitioner was a "member of the crew" entitled to maintain the action under the Jones Act. The petitioner's work in *Senko* was that of handyman, and it included the carrying and storing of supplies, and the general maintenance of a dredge.

The Supreme Court in *Senko, supra,* stated at page 371, 77 S.Ct. at page 416:

"He filed this suit under the Jones Act in the City Court of Granite City, Illinois, to recover damages for his injuries. The Act provides a cause of action for 'any seaman who shall suffer personal injury in the course of his employment.' 41 Stat. 1007, 46 U.S.C. § 688. This Court, however, has held that the Longshoremen's and Harbor Workers' Compensation Act of March 4, 1927, 44 Stat. 1424, 33 U.S.C. § 901 et seq., restricts the benefits of the Jones Act to 'members of a crew of a vessel.' Swanson v. Marra Bros., Inc., 328 U.S. 1, 66 S.Ct. 869, 90 L.Ed. 1045. To recover, therefore, petitioner

had to be a member of a crew, as that term is used in the Longshoremen's Act, at the time of his injury."

The court stated, at page 372, 77 S.Ct. at page 417:

"It is true that the dredge was anchored to the shore at the time of petitioner's injury and during all the time petitioner worked for respondent. It is also true that this dredge, like most dredges, was not frequently in transit. We believe, however, that there is sufficient evidence in the record for the jury to decide that petitioner was permanently attached to and employed by the dredge as a member of its crew.

Petitioner's witnesses testified that he was known as a 'deckhand' among rivermen. They said that he was hired to clean and take care of the deck, splice rope, stow supplies, and, in general, to keep the dredge 'in shape.' This testimony indicated that substantially all of petitioner's duties were performed on or for the dredge. A normal inference is that petitioner was responsible for its seaworthiness. * * In short, the duties of a man during a vessel's travel are relevant in determining whether he is a 'member of a crew' while the vessel is anchored. Thus, the fact that this dredge was connected to the shore cannot be controlling.

The fact that petitioner's injury occurred on land is not material. Admiralty jurisdiction and the coverage of the Jones Act depends only on a finding that the injured was 'an employee of the vessel, engaged in the course of his employment' at the time of his injury. Swanson v. Marra Bros., Inc. 328 U.S. 1, 4, 66 S.Ct. 869, 870 [90 L.Ed. 1045], citing O'Donnell v. Great Lakes Dredge & Dock Co., 318 U.S. 36, 63 S.Ct. 488, 87 L.Ed. 596.[3]

As we have said before, this Court does not normally sit to re-examine a finding of the type that was made below. We believe, however, that our decision in South Chicago Co. v. Bassett, 309 U.S. 251, 60 S.Ct. 544, 84 L.Ed. 732, supra, has not been fully understood. Our holding there that the determination of whether an injured person was a 'member of a crew' is to be left to the finder of fact meant that juries have the same discretion they have in finding negligence or any other fact. The essence of this discretion is that a jury's decision is final if it has a reasonable basis, whether or not the appellate court agrees with the jury's estimate.

Because there was testimony introduced by petitioner tending to show that he was employed almost solely on the dredge, that his duty was primarily to maintain the dredge during its anchorage and for its future trips, and that he would have a significant navigational function when the dredge was put in transit, we hold there was sufficient evidence in the record to support the finding that petitioner was a member of the dredge's crew. Cf. Gianfala v. Texas Co., 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 775, reversing 5 Cir., 222 F.2d 382. Accordingly, we reverse the decision below."

In this circuit, the fairly recent case of Harney v. William Moore Building Corp., 359 F.2d 649 (2 Cir. 1966), discussed the question of seaman's status quite comprehensively. The court, in *Harney, supra*, stated at page 654:

"We turn now to the question whether it was error to deny Harney a jury trial on his claim of seaman status. It is well settled that only a master or member of a crew is entitled to recover under the Jones Act. Swanson v. Marra Bros., supra; Jones Act, 46

---

3. "The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land." 62 Stat. 496, 46 U.S.C. § 740.

U.S.C. § 688; Longshoremen's Act, 33 U.S.C. § 903(a) (1). *And it has been said that to be a member of the crew the vessel must be in navigation, there must be a more or less permanent connection with the ship, and the worker must be aboard naturally and primarily as an aid to navigation.* McKie v. Diamond Marine Co., 204 F.2d 132, 136 (5 Cir. 1953). In 'aid to navigation,' navigation is read very broadly, so as to include cooks and others who contribute to the welfare of the ship even though they do not 'reef, hand or steer.' (Emphasis added)

The parties have not expressed any doubt that this vessel is in navigation. The requirement of a permanent connection has generally had the effect of excluding temporary repairmen from Jones Act recovery, but might be read to reach shore-based employees who, though regularly coming aboard spend less than a full shift there. The rule that the worker must be aboard naturally and primarily as an aid to navigation, South Chicago Coal & Dock Co. v. Bassett, 309 U.S. 251, 258–259, 60 S.Ct. 544, 84 L.Ed. 732 (1940), and cases cited, does not appear in recent years to have been interpreted literally. In Senko v. LaCrosse Dredging Corp., 352 U.S. 370, 77 S.Ct. 415, 1 L.Ed.2d 404 (1957), the court, in upholding a jury verdict for plaintiff, observed that he would have 'a significant navigational function.' 352 U.S. at 374, 77 S.Ct. at 418. In Offshore Co. v. Robison, 266 F.2d 769, 75 A.L.R.2d 1296 (5 Cir. 1959), the court said of the 'naturally and primarily' language 'this test has been watered down until the words have lost their natural meaning.'

Of course, the three requirements of membership in the crew ought not to be applied without regard to each other. A less permanent connection with the ship might require a more significant navigational function. Compare the language in the dissent by Judge Lumbard in Weiss v. Central R. Co. of New Jersey, 235 F.2d 309, 315 (2 Cir. 1956).

Whether plaintiff in a Jones Act case is a crewman is a question of fact, or a mixed question of law and fact. * * *

In some cases plaintiff has had, in addition to other duties, a number of duties traditionally associated with crewmen. In *McKie, supra,* p. 654, plaintiff worked on a dredge, and in addition to duties involving the dredging, he tended lines, maneuvered the vessel, and operated a tender which towed the dredge. The court held that crew status presented a jury question. See also Gahagan Const. Corp. v. Armano [165 F.2d 301], supra, p. 653, where the deckhand on a dredge also repaired line, fixed anchors, worked the tug, checked running lights, washed the deck, pumped the hold, and took bearings. In Senko v. LaCrosse Dredging Corp., supra, plaintiff was employed on a stationary dredge and would have had a significant navigational function if the dredge had been moved, and his actual duties included cleaning the deck, splicing rope, stowing supplies, and in general keeping the dredge in shape. (Contrast, however, Justice Harlan's view of the facts, in dissent.) And in Weiss v. Central R. Co., supra, plaintiff was aboard a ferry to chock the wheels of railroad cars, but he also operated the wheel, handled line, kept lookout, adjusted the rudder-pin, and cleaned the ferry. See also Offshore Co. v. Robison, supra, p. 654.

It is not clear from these cases whether the duties on board which contribute to the functioning of the vessel's mission, but do not contribute to the functioning of the vessel itself, are also among those whose presence may lead to a 'salty inference.' The possibility that they are becomes important in those cases where the purely nautical tasks are reduced to a minimum. (Footnote omitted) * *

But we need not decide whether tasks performed aboard ship in furtherance of the vessel's special mission, but not of the vessel itself, are evidence of crewman status. Accordingly we need not decide whether priming the cofferdam pumps with the barge pump was such a task. For we hold that the evidence that Harney was required to pump out the vessel, keep watch, and, if the vessel were to break away, secure it, permit an inference of crewman status and merit a jury's consideration. We so read the recent Supreme Court authority, particularly Butler v. Whiteman, 256 U.S. 271, 78 S.Ct. 734, 2 L.Ed.2d 754, supra, p. 654.*

In *Butler*, a tug was undergoing repairs, and had not made steam for one year. While the facts concerning the employee's duties are sketchy, even in the opinion of the Court of Appeals, Harris v. Whiteman, 243 F.2d 563 (5 Cir. 1957), it appears that plaintiff was a laborer doing odd jobs about the wharf and the tug, and had cleaned the tug's boiler. The Supreme Court held that it was error not to let the jury decide the question of crewman status. Harney's 'navigational' duties are no more minimal than were Butler's. And the testimony indicating that the tug might not have been in navigation, which could lead to an inference that Butler was not a crewman, is comparable to the testimony here that Harney was aboard only two to three hours each shift. Thus the evidence indicating that Butler was a crewman is no stronger than that favoring Harney here, and Harney should be able to get to the jury. * * * "

In the recent case of Noble Drilling Corporation v. Smith, 412 F.2d 952 (5 Cir. 1969), cert. denied 396 U.S. 906, 90 S.Ct. 221, 24 L.Ed.2d 182, the court was faced with the question of whether a mudpumper who was hired to work on a stationary off-shore drilling platform as part of a completion crew, but who because of experience was assigned to operate a mudpump which was permanently affixed to the deck of a self-propelled tender, was a "seaman" or "member of the crew" of a vessel within the contemplation of the Jones Act.

Circuit Judges Goldberg, Thornberry and Wisdom held that plaintiff was a seaman and affirmed the district court.

The court stated in part, at page 956:

"Today, therefore, there is no practical difference between the terms 'seaman' and 'member of the crew' except in those cases where the maritime employee had only such transitory connections with the vessel that he was not a crew member. Cf. Texas Company v. Savoie, 5 Cir. 1957, 240 F.2d 674, cert. denied 355 U.S. 840, 78 S.Ct. 49, 2 L.Ed.2d 51. Thus if there is an evidentiary basis for this status question to go to the jury, the distinction has lost all relevance. See, Hardaway Contracting Co. v. O'Keeffe, 5 Cir. 1968, 414 F.2d 657.

For the standard to be used in determining whether there was a jury question with respect to Smith's maritime status, we refer to the words of Judge Wisdom in Offshore v. Robison, supra, 266 F.2d at 779–780:

"[T]here is an evidentiary basis for a Jones Act case to go to the jury: (1) *if there is evidence that the injured workman was assigned permanently to a vessel (including special purpose structures not usually employed as a means of transport by water but designed to float on water) or performed a substantial part of his work on the vessel; and (2) if the capacity in which he was employed or the duties which he performed contributed to the function of the vessel or to the accomplishment of its mission, or to the operation or welfare of the*

* 356 U.S. 271, 78 S.Ct. 734, 2 L.Ed.2d 754.

*vessel in terms of its maintenance during its movement or during anchorage for its future trips.'* (Emphasis added)

\*    \*    \*    \*    \*    \*

"Attempts to fix unvarying meanings have a firm legal significance to such terms as 'seaman,' 'vessel,' 'member of crew' must come to grief on the facts. These terms have such a wide range of meaning, under the Jones Act as interpreted in the courts, that, except in rare cases, only a jury or trier of the facts can determine their application in the circumstances of a particular case. Even where the facts are largely undisputed, the question at issue is not solely a question of law when, because of conflicting inferences that may lead to different conclusions among reasonable men, a trial judge cannot state an unvarying rule of law that fits the facts. The Jones Act cases involving coverage are similar in this respect to many negligence and contributory negligence cases.

Under the Jones Act, judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether with reason, the conclusion may be drawn that the claimant was a seaman, a member of a crew of a vessel."

"Applying this standard to the case *sub judice*, we find that 'with reason, the conclusion may be drawn that [Smith] was a seaman member of the crew of a vessel.' First, Smith was assigned to operate the mud pump which was permanently emplaced on the tender S 25, which undisputedly was a vessel, and he spent a substantial amount of his working time on the vessel. Second, his duties with respect to the mud pump directly contributed to the fulfillment of one of the primary functions of the tender S–25—the pumping of mud and other fluids to the drilling platform for use there.

There was, therefore, sufficient evidence to send the status question to the jury and to support the jury's finding that Smith was a Jones Act seaman. See, Producers Drilling Co. v. Gray, 5 Cir. 1966, 361 F.2d 432; Stanley v. Guy Scroggins Construction Co., 5 Cir. 1961, 297 F.2d 374; cf. Braniff v. Jackson Ave.-Gretna Ferry, Inc., 5 Cir. 1960, 280 F.2d 523."

In the more recent case of Kimble v. Noble Drilling Corporation, 416 F.2d 847 (5 Cir. 1969), Rehearing denied Nov. 4, 1969, the court of appeals (Thornberry, J., Dyer, J. and Fisher, J.) affirmed the district court for the Eastern District of Louisiana and held that the question of whether an employee of oil companies who was twice injured on stationary platforms at sea was entitled to recover from companies for his injuries under the Jones Act and General Maritime Law, was for a jury where there was evidence that he was assigned to a vessel tending platform on which he worked in each instance, and there was evidence that duties performed by him contributed to the function and mission of vessels which supported the platform.

The main question presented in this admiralty appeal is whether appellee Kimble could properly be found to have been a seaman for purposes of the Jones Act and General Maritime Law at the time of his injuries.

In that case the drilling platforms were permanent, immobile, artificial islands affixed to the ocean floor, but the tenders, although they remained adjacent to the platform for the most part, were mobile vessels that could be shifted from platform to platform or taken into open sea in rough weather.

Plaintiff Kimble there was a "driller" for defendant company which owned the drilling rigs on the platform. He did most of his work on the stationary platform, but there was considerable evidence that he had substantial duties aboard the tender.

The court in *Kimble* followed the *Smith* case *supra,* which followed the

*Offshore* case *supra.* The court in *Kimble* used and reiterated the established test and standard set forth in *Offshore, supra,* as to whether or not a man is a "seaman" and stated, 416 F.2d at page 849:

"Under this test, coverage of the Jones Act has been extended to a wide variety of ships' personnel not traditionally thought of as seamen but subject, as are seamen, to the negligence hazards with which the Jones Act was intended to deal. The case at bar clearly falls within the province of the jury because (1) there is undoubtedly some evidence that Kimble was assigned permanently to the vessel tending the platform on which he worked in each instance and (2) there is ample evidence that the duties Kimble performed contributed to the function and mission of the tender, since its sole reason for existence was to support the platform in drilling for oil."

The Supreme Court most recently in Nacirema Co. v. Johnson, 396 U.S. 212, 90 S.Ct. 347, 24 L.Ed.2d 371, decided Dec. 9, 1969, reiterated the premise that

"Since long before the Longshoremen's Act was passed it has been settled law that structures such as wharves and piers, permanently affixed to land, are extensions of land." (citations omitted)

Thus, literally read, a statute which covers injuries "upon the navigable waters" would not cover injuries on a pier even though the pier, like a bridge, extends over navigable waters.

The court in Johnson cited Rodrigue v. Aetna Casualty Co., 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 in this regard. In *Rodrigue* the court at page 360, 89 S.Ct. at page 1839 stated:

"Admiralty jurisdiction has not been construed to extend to accidents on piers, jetties, bridges or even ramps or railways running in to the sea." (citations footnotes omitted)

The court in *Johnson, supra,* quoted from the Extension of Admiralty Jurisdiction Act, 62 Stat. 496, 46 U.S.C. § 740 (Extension Act) in part:

"The Admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land."

The court then said:

"By its very choice of language, the Act reenforces the conclusion that Congress was well aware of the distinction between land injuries and water injuries and that when it limited recovery to injuries on navigable waters, it did not mean injuries on land. The Act no doubt extended the admiralty tort jurisdiction to ship-caused injuries on a pier. But far from modifying the clear understanding in the law that a pier was an extension of land and that a pier injury was not on navigable waters but on land, the Act accepts that rule but nevertheless declares such injuries to be maritime torts if caused by a vessel on navigable waters.

The Extension Act was passed to remedy the completely different problem which arose from the fact that parties aggrieved by injuries done by ships to bridges, docks, and the like could not get into admiralty at all. There is no evidence that Congress thereby intended to amend or affect the coverage of the Longshoremen's Act or to overrule Swanson v. Marra Bros., supra, decided just two years earlier."

The fact that plaintiff's decedent was called a "deckhand" by the City of New York is not presumptive of the fact that he is a "seaman" as required under the Jones Act, as the City cannot usurp the power of the Congress. Wolbert's primary duty was to raise and lower aprons and to close the doors for passenger loading and unloading.

Wolbert performed no duties in connection with the navigation of the ferry

boat Kennedy or any other ferry, except the incidental one of making lines fast and unfast when tying to a dock or alongside a vessel as part of the nighttime berthing operation. Wolbert was a land based worker, working on land, and Defendant's Exhibit A in evidence shows that for almost two years prior to the accident there was only one isolated instance, on March 21, 1965, more than ten months before the accident, when he was given an assignment as "deckhand" on the ferry boat Merrill. Defendant's Exhibit A further shows that for the calendar years 1962, 1963, 1964 and 1965 and for January, 1966, up to the time of the accident, the work record of plaintiff's decedent was comprised of:

no work aboard a vessel in 1966;

one day aboard a vessel in 1965;

one day aboard a vessel in 1964;

one day aboard a vessel in 1963; and

five days aboard a vessel in 1966.

Wolbert's duties were more consonant with the duties of a laborer or harbor worker in that he slept at home, worked an eight hour shift, had no seaman's papers, was not permanently assigned to work aboard a vessel on the accident date or for over ten months prior to the accident.

Wolbert was on the vehicle bridge and dock aprons which are land or extensions of land (see, *Johnson, supra*) and sustained his injuries on land and not on a vessel. His injury was not sustained by a vessel either; the most that can be said is that it occurred in the vicinity of a vessel. Under the tests and standards set by the courts of appeal and under the definitions and standards espoused by the Supreme Court, as were more fully discussed above, Wolbert clearly does not fall into the category of "seaman," as required for Jones Act cases. His possession of an old Master's Certificate from the ferry boat Merrill, a ferry boat he had worked on for one day more than 10 months prior to the accident is not suggestive of or presumptive of the fact that he was a seaman.

The decedent was not a "deckhand" comparable to the ones on the ferry boats plying in navigable waters between New York and Staten Island who were listed as members of the crew in the ships' logs. He was not subject to the risks and hazards of a deckhand on vessels. Under extreme circumstances, when a vessel is in trouble, the deckhand on the boat had the risk and hazard of first seeing that the passengers were taken care of. This is a risk and hazard that plaintiff's decedent was never subjected to. The evidence indicates clearly that there are two types of deckhands. In his examination before trial plaintiff's decedent testified (Trial Transcript, page 39) that he was a deckhand assigned to a vessel to load and unload passengers and cars and to act as lookout when ordered by the Captain. In question 6 (b) of plaintiff's interrogatories, however, the following interrogatory was asked and the following answer given:

"Question 6(b)

What duties did the plaintiff have, if any, in the fulfillment of his work as an employee of the defendant on January 29, 1966, prior to the time of his accident?

Answer 6(b): The plaintiff was assigned to Whitehall terminal as an apron man or a bridge man on land."

Since plaintiff has conceded that the only claim presented for recovery is under the Jones Act, plaintiff must therefore be non-suited.

Plaintiff of course, has a right to present a claim for State Workmen's Compensation, which right has been preserved by the filing of a notice of claim therefor by the City of New York.

Defendant's motion made at the end of defendant's case for judgment is granted on the grounds that plaintiff's decedent was not in the status of a "seaman" under the Jones Act, supra.

Findings of Fact and Conclusions of Law, together with a decree, are to be submitted within 30 days.

So ordered.