11 McKAY, Judge.
STATEMENT OF THE CASE
Charles Powell filed suit for personal injuries allegedly sustained when he was *115 exposed to asbestos from 1955 to 1962 while he was employed by Exxon (formerly Humble Oil) as a roustabout. Plaintiff alleged Jones Act seaman status as a member of the crew aboard “LST”s, which are converted tank landing ships used in WWII that measure some 250 feet in length. Absent seaman status, plaintiffs tort claim against Exxon, his employer, would be barred. Contesting plaintiffs seaman status, Exxon filed a motion for summary judgment. The trial court found that plaintiff was not a Jones Act seaman and granted Exxon’s motion for summary judgment in open court on June 26, 1998. A written judgment to that effect was signed on June 29, 1998. The plaintiff filed an application for supervisory writs with this Court on July 11, 1998, arguing that the trial court erred in finding that he was not a Jones Act seaman, and in taking that question from the jury. On September 10, 1998, this Court granted plaintiffs writ and reversed the | ¿judgment of the trial court. However, the Supreme Court remanded the case for briefing, argument and an opinion by this Court.
DISCUSSION
The standard of who qualifies as a seaman was clarified in Chandris, Inc. v. Latsis, 515 U.S. 347, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995). The two-fold test provided for seaman status in Chandris is: 1) the worker’s duties must contribute to the function of the vessel or to the accomplishment of its mission; and 2) the worker must have a connection to a vessel (or an identifiable group of vessels) in navigation that is substantial in terms of both its duration and its nature. The second requirement was rephrased later in the opinion: “the Jones Act remedy is reserved for sea based maritime employees whose work regularly exposes them to the ‘special hazards and disadvantages to which they who go down to sea in ships are subjected.’ ” Chandris (quoting Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946)). The Court also stated that “the ultimate inquiry is whether the worker in question is a member of a vessel’s crew or simply a land-based employee who happens to be working on the vessel at a given time.” Chandris, 115 S.Ct. at 2191. In addition the Court reiterated its statement from Wilander that “the inquiry into seaman status is of necessity fact specific; it will depend on the nature of the vessel and the employee’s precise relation to it.” Chandris (quoting McDermott Int’l, Inc. v. Wilander, 498 U.S. 337, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991) ). As a rule of thumb to be used as a guideline the Court opined that “a worker who spends less than 30% of his time in the service of the vessel in 13navigation should not qualify as a seaman under the Jones Act.” Chandris, 115 S.Ct. at 2191. The Court further noted that the Jones Act was intended to protect sea-based maritime workers, who owe their allegiance to a vessel, and not land-based employees, who do not.
As to whether the determination of seaman status is a question of law or fact, the Court stated:
It is important to recall that the question of who is a “member of a crew,” and therefore who is a “seaman,” is a mixed question of law and fact. Because statutory terms are at issue, their interpretation is a question of law and it is the court’s duty to define the appropriate standard. Wilander, 498 U.S., at 356, 111 S.Ct., at 818. On the other hand, “[i]f reasonable persons, applying the proper legal standard, could differ as to whether an injured person who was a ‘member of a crew,’ it is a question for the jury.” Ibid. See also Senko, 352 U.S., at 374, 77 S.Ct., at 417 (explaining that “the determination of whether an injured person who was a ‘member of a crew1 is to be left to the finder of fact” and that “a jury’s decision is final if it has a reasonable basis”). The jury should be permitted, when determining whether a maritime employee has the requisite employment-related connection to a vessel in navigation to qualify as a member of the vessel’s crew, to consider *116 all relevant circumstances bearing on the two elements outlined above.
Chandris, 515 U.S. at 369, 115 S.Ct. at 2190.
As to whether summary disposition may be appropriate in certain cases, the Court stated: “Where undisputed facts reveal that a maritime worker has a clearly inadequate temporal connection to vessels in navigation, the court may take the question from the jury by granting summary judgment or a directed verdict.” Chandris, 515 U.S. at 370, 115 S.Ct. at 2191.
In this case, the plaintiff argues he was exposed to asbestos during performance of his duties aboard the LSTs involving assembling and installing production equipment, cutting gaskets, working with asbestos packing material, Rmixing asbestos-containing drilling muds, working in the vicinity of others using asbestos, and bunking on board the LSTs next to friable asbestos pipe insulation. In his opposition to the motion for summary judgment, the plaintiff outlined his duties as: attending safety meetings concerning onboard procedures aboard LSTs, performing maintenance and cleaning duties aboard LSTs during inclement weather, performing evacuation and man overboard drills aboard the LSTs, training in on-ship fire-fighting aboard LSTs, and regularly securing supply and crew vessels alongside LSTs. At his deposition, Mr. Powell explained the workings of the LSTs. The LSTs would be attached to a fixed platform, and some work such as the assembly of equipment to be installed on the platform was performed on the LST. Mr. Powell would bunk on the LST. The LSTs had no engines, so after a job was finished, the LST would be towed to another location. The crew would get back and forth from the LST on converted shrimp boats or occasionally aboard speedboats or helicopters. The LSTs stocked life-saving equipment, lifeboats, life floats, life jackets, navigational lights, bilge pumps, foghorns, radar and ship-to-shore transceivers and other communication capabilities. The crew always consisted of the same men. In his affidavit, Mr. Powell further stated that he spent more than 30% of his time performing employment related duties aboard the LSTs.
At the hearing, the trial court stated that its main consideration was whether LSTs are vessels for the purposes of the statute. Counsel for the defense stated:
[T]he fact of the matter [was] that a substantial portion of [the plaintiffs] work was not related to the mission of the vessel. The only mission that the vessel had was to provide housing and sleeping quarters for the men who worked aboard the production, the oil field platform.
| fiEven by Mr. Powell’s own admission, only thirty percent of his work was done on the fixed platform and all of that work was done for purposes of the assemblers and separators and precip-itators for installation on the production of the well itself.
Defense counsel contended that the vessel never had a mission, that it was in fact incapable of sailing, that it was anchored and fixed to the platform on which the plaintiff did 70% of his work. Defense counsel also maintained that the only work the plaintiff did on the LSTs was assembly of equipment to be used on the platform and pointed out that the plaintiff was never assigned to a vessel.
Plaintiffs counsel then argued that under Kimble v. Noble Drilling Corp., 416 F.2d 847 (5th Cir.1969), LSTs are unquestionably vessels. Therefore, the only determination left was whether the plaintiff was a seaman aboard the vessel. Counsel then argued, referring to the “duration” and “nature” elements of the test, that plaintiff was a seaman considering the time he spent aboard the LSTs.
In Kimble, the employee was first employed as a “driller”, and in that capacity was in charge of a four man crew that worked in alternating shifts on a drilling platform. Attached to the platform was. a *117 converted LST. The U.S. Fifth Circuit noted “the drilling platforms were permanent, immobile artificial islands affixed to the ocean floor, but the tenders (or converted LSTs), although they remained adjacent to the platforms for the most part, were mobile vessels that could be shifted from platform to platform or taken into open sea in rough weather.” Kimble at 848.
The facts of the case were:
At the time of his first injury, appellee Kimble worked as a “driller” for Noble Drilling Company, which owned the drilling rigs on the platform and had been hired by Chevron to perform the actual drilling operation. As a driller, Kimble was in charge of one of the four-man crews that worked in alternating shifts on the platform, but there is considerable evidence in the record to support Kimble’s claim that he |fialso had substantial duties on board the tender. In particular, he had responsibility for making sure the drilling mud, which was pumped from the mud room on the vessel was properly mixed. As ancillary duties, therefore, he was charged with maintenance of the mud room equipment and mud pumps, with training and supervising his crew, with maintaining pipes, and with helping in connecting and disconnecting lines from the vessel to the platform when the vessel was moved. Moreover, his activities were always closely related to activity on the vessel, which served as a supply, personnel, equipment, fuel and command center for the entire drilling operation. A part of the reason for his first injury, for example, seems to have been the absence of necessary tools, which he had sent a member of his crew to fetch from the tool room on the vessel.
In addition, during his tour of duty, which was ten days long followed by five days off, Kimble was assigned a permanent room on board the vessel; he ate and slept aboard. While on board, he was subject to the discipline of the master of the ship and underwent many of the same hazards of the sea to which other members of the crew were subjected. There is even some evidence that he was required on occasion to perform tasks that a more traditional blue-water seaman might be expected to perform, although these were probably rare.
At the time of Kimble’s second injury, he was a member of a floor crew rather than a driller, and his responsibilities with respect to the mud operation were somewhat reduced. But numerous incidents of the relation of his employment to the vessel remained.
Kimble at 849.
In Kimble, the jury found that the plaintiff was a seaman and the Fifth Circuit affirmed this judgment.
In the instant case, Mr. Powell’s job responsibilities seem very similar to those of the plaintiff in Kimble. Although Kimble was decided before the Chandris test, the same considerations given in that case seem to render the LST here a “vessel” under Chandris. The facts of this case also suggest there may be genuine issues of fact as to whether the plaintiffs duties contributed to the function of the vessel or to the accomplishment of its mission, and whether he had a connection to a vessel (or an identifiable group of vessels) in navigation that was substantial in terms of both its duration and its nature. Accordingly, summary | judgment was inappropriate. Therefore, the judgment of the trial court is reversed and this matter is remanded for trial on the merits.
REVERSED AND REMANDED.
KATZ, J. CONCURS WITH REASONS