Denyse Nettune Jordan SMITH, etc.,
Plaintiff-Appellant,

v.

PAN AIR CORP., et al.,
Defendants-Appellees.

Martha KOLB, etc., Plaintiff-Appellant,

v.

TEXACO, INC. and Pool Offshore Co.,
Defendants-Appellees.

PETROLEUM HELICOPTERS, INC. and American Home Assurance Co.,
Plaintiffs-Appellants,

v.

POOL COMPANY OF TEXAS,
Defendant-Appellee.

Nos. 81–3522, 81–3675 and 81–3638.

United States Court of Appeals,
Fifth Circuit.

Aug. 23, 1982.

$247,350.00

Orlando G. Bendana, New Orleans, La., for Smith.

Brad G. Theard, New Orleans, La., for Pan Air Corp.

Bailey & Leininger, B. Ralph Bailey, Donald D. Bann, Metairie, La., Arthur Crais, New Orleans, La., for Shell Oil Co.

Lugenbuhl, Larzelere & Ellefson, Russell D. Pulver, New Orleans, La., for Petroleum Helicopters, Inc., et al.

Domengeaux & Wright, Wm. P. Rutledge, Lafayette, La., for Kolb.

Caffery, Oubre & Duzar, Patrick T. Caffery, New Iberia, La., for Texaco, Inc.

Johnson & McAlpine, Ronald A. Johnson, John F. Colowich, New Orleans, La., for Pool Offshore.

Before RUBIN, REAVLEY and TATE, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge.

The scope of admiralty jurisdiction over suits arising from aircraft crashes has never been fully explored by this Circuit. These cases require us to consider the extent of that jurisdiction. If there is jurisdiction, some of the cases also involve the effect of the Outer Continental Shelf Lands Act on such suits. Finally, one case raises the question whether an aircraft is a "vessel" for Jones Act purposes.

We first sketch briefly the facts in each case.

I.

**81–3522 Smith v. Pan Air Corp.**

Curtis C. Jordan was a pilot regularly engaged in flying a plane to transport passengers engaged in mineral exploration and development activity to and from locations in Louisiana and off its shores. Using a plane equipped to take off from either land or water, he departed from the New Orleans Lakefront Airport with two passengers, one of them to be taken to a Shell Oil Company mineral operation located in Louisiana near the mouth of the Mississippi River. It was not practicable, however, to reach Shell's site by land travel. Using water flotation equipment, Jordan landed in a canal adjacent to Shell's facilities. After the Shell-bound passenger disembarked, Jordan took off from the canal, and almost immediately encountered a fog bank. Trying to escape the fog, he came dangerously close to an antenna tower owned by Shell. Although Jordan succeeded in avoiding the tower, the plane struck a set of its supporting guy wires and crashed onto Louisiana soil, killing Jordan instantly.[1] Invoking Fed.R.Civ.P. 9(h), his widow and child seek damages in admiralty for his death from his employer, Pan Air, contending that the

---

1. The second passenger was also killed in the crash. The claim for damages arising out of his death has been dismissed.

plane was a "vessel" and that Jordan was a member of its crew, hence entitled to the benefits of the Jones Act, 46 U.S.C. § 688 (1976). The plaintiffs also assert maritime tort claims for the alleged unseaworthiness of the plane. Finally, they invoke diversity jurisdiction to support claims against Pan Air for the alleged defective and unreasonably dangerous nature of the aircraft, and against Shell for "gross negligence".[2] Finding claims arising from the aircraft crash not to be within its maritime jurisdiction, the district court granted Pan Air's motion to dismiss all "admiralty claims" against it.[3] In his opinion, the judge also concluded that Jordan was not a Jones Act seaman.

*81–3675 Kolb v. Texaco, Inc.*

*81–3638 Petroleum Helicopters, Inc. v. Pool Co.*

Walter Kolb was a helicopter pilot regularly engaged in transporting workers and equipment from the Louisiana mainland to and between drilling rigs and platforms located in the Gulf of Mexico. He was assigned to transport a passenger to work on a fixed platform located on the outer Continental Shelf, owned by Texaco, whose well was being "worked over" by Pool Company. A crane owned by Texaco was situated on the platform; its crane arm extended over the Gulf, and a crane ball hung from the crane arm. After landing on the helipad and discharging the passenger, Kolb took off from the platform. As he departed, the helicopter's main rotor blade struck the crane ball, causing the helicopter to crash into the Gulf. Mrs. Kolb sued Texaco and the other company engaged in work on the platform in admiralty for damages sustained as a result of her husband's death;

Petroleum Helicopters sought recovery, also in admiralty, for the loss of its aircraft. Mrs. Kolb has abandoned any claim under the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331–1356 (1976 & Supp. III 1979) (OCSLA), that would be determined by the application of Louisiana law. Petroleum Helicopters invokes diversity as well as admiralty jurisdiction. The district judge dismissed both claims, insofar as they invoked admiralty jurisdiction, for want of jurisdiction.[4]

## II.

In 1813, Justice Story, on Circuit, stated that "[i]n regard to torts ... the jurisdiction of the admiralty is exclusively dependent upon the locality of the act."[5] The federal courts, therefore, defined the scope of maritime jurisdiction over tort claims solely by reference to locality until the Supreme Court reset the compass, at least with regard to claims arising out of aircraft crashes, in 1972. In *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), the Court first considered whether the principles formulated a century and a half earlier for those who go down to the sea in ships apply to air transportation. We, therefore, examine that decision with care.

Justice Stewart, writing for a unanimous court, spelled out the holding of *Executive Jet* in concluding the opinion: "in the absence of *legislation to the contrary*, there is no federal admiralty jurisdiction over aviation tort claims arising from flights by *land-based aircraft between points within the continental United States*." *Id.* at 274, 93 S.Ct. at 507, 34 L.Ed.2d at 471 (emphasis added). This holding does not directly dispose of any of the claims under review here,

**2.** It is not clear from the record whether this claim is also intended to be within admiralty jurisdiction, or is based only on diversity.

**3.** Thus, the plaintiffs' diversity claims against Pan Air, as well as all claims against Shell, *see* note 2 *supra*, are still pending. The district judge's granting of Pan Air's motion to dismiss the admiralty claims is nevertheless an appealable order under 28 U.S.C. § 1292(a)(3). Of course, to the extent that plaintiffs' claim against Shell is grounded in admiralty, our rea-

soning with regard to the admiralty claims against Pan Air is equally applicable.

**4.** Petroleum Helicopters's diversity claim is still pending in district court. Mrs. Kolb has apparently renounced any claim other than for negligence under general maritime law.

**5.** *Thomas v. Lane*, 23 F.Cas. 957, 960 (C.C.D. Me.1813) (No. 13,902).

but its underlying rationale is crucial and the quoted language suggests three of the questions we must consider: (1) What is "legislation to the contrary"? (2) What is the meaning of the restrictive adjectival phrase, "land-based aircraft"? (3) Does jurisdiction extend to flights that are to or from points outside the continental land mass?

### A. The *Smith* Claim

At the outset, we note that the *Smith* claim comes closest of those under review to falling directly under *Executive Jet*'s holding. No assertion has been made that "legislation to the contrary"[6] exists to bring the *Smith* plaintiffs' claim within the admiralty jurisdiction. Furthermore, the flight that crashed was apparently "between points within the continental United States."[7] Therefore, if Jordan's aircraft were considered "land-based," it is at least possible[8] that the district judge could have dismissed the Smiths' admiralty claims under the literal language of *Executive Jet* in its narrowest possible reading. For the purposes of this appeal, however, we assume that Jordan's seaplane, which was capable both of landing on and taking off from water in normal, nonemergency use, was not a "land-based" aircraft. Therefore, to decide this case, we go beyond *Executive Jet*'s precise holding to its underlying rationale.

Smith argues that admiralty jurisdiction extends to all claims having a functional relationship to maritime commerce, regardless of the locality of the tort. In *Executive Jet*, a jet aircraft struck a flock of

seagulls during takeoff from a Cleveland, Ohio, airport and crashed into Lake Erie. The plaintiffs sought to maintain a suit in admiralty because the plane had crashed into navigable waters. The Supreme Court first discussed the serious difficulties with the traditional test for admiralty jurisdiction because of that test's focus solely on the locality of the accident. The Court noted the difficulty of applying that test in "perverse and casuistic borderline situations;" the virtual absurdity of applying the test, and the "full panoply of the substantive admiralty law," to injuries to swimmers at a public beach; and the inadvisability of turning jurisdiction on the fortuity that the aircraft finally hit land rather than navigable water, or *vice versa*.[9] After considering observations by courts, commentators, and the American Law Institute and discussing congressional extension of admiralty jurisdiction to land structure injuries caused by vessels, the Court stated: "in determining whether there is admiralty jurisdiction over a particular tort or class of torts, reliance on the relationship of the wrong to traditional maritime activity is often more sensible and more consonant with the purposes of maritime law than is a purely mechanical application of the locality test."[10]

Some commentators, suggesting deficiencies and inconsistencies in any test that relies on locality at all, read *Executive Jet* as commanding, or at least permitting, the determination of admiralty jurisdiction solely by the relationship of the "wrong" to traditional maritime activity.[11] They note

---

**6.** For our discussion of "legislation to the contrary" relevant to these cases, see Part IIB *infra*.

**7.** The flight that Jordan had just completed was between New Orleans and Shell's facility, on land, near the mouth of the Mississippi River—clearly "between points within the continental United States." Apparently, Jordan was returning to the New Orleans airport when he crashed. Whether this is so, however, is immaterial, because we find that there is no admiralty jurisdiction over the *Smith* claim on a ground that would not be affected by the correctness of this assumption. *See* text *infra*.

**8.** *See* note 7 *supra*.

**9.** *See generally Executive Jet, supra*, 409 U.S. at 253–60, 93 S.Ct. at 497–501, 34 L.Ed.2d at 458–62.

**10.** *Id.* at 261, 93 S.Ct. at 501, 34 L.Ed.2d at 463.

**11.** *See, e.g.*, Note, *Admiralty Jurisdiction*: Executive Jet *in Historical Perspective*, 34 Ohio St.L.J. 353, 369–70 (1973); Note, *The Other Half of Executive Jet: The New Rationality in Admiralty Jurisdiction*, 57 Tex.L.Rev. 977 (1979); Comment, *Admiralty Tort Jurisdiction: Floundering on the Sea of Inconsistency*, 27

that, for example, the traditional maritime remedy of maintenance and cure has always been extended to disabilities arising from injuries suffered on land; that the Admiralty Extension Act expands maritime jurisdiction to include damage to land structures caused by vessels on navigable waters; and that "the doctrine of unseaworthiness has been extended to permit a seaman or a longshoreman to recover from a ship owner for injuries sustained wholly on land, so long as those injuries were caused by defects in the ship or its gear." [12]

■ There are, however, patent difficulties in determining what kinds of "wrong" are related to traditional maritime activities. If we define the "wrong" as the negligent act, then it is difficult to see how defects in the design of an aircraft, faults in its manufacture or maintenance, or pilot error are maritime. Yet we, as well as other courts, have asserted admiralty jurisdiction over such claims.[13] Those who advocate a "relationship of the wrong" test really ly look not to the kind of wrong but to the nature of the activity in which the victim and his aircraft are engaged.

Moreover, nothing in *Executive Jet* indicates that the Court adopted such a functional test. Instead, the entire thrust of the opinion is that locality *alone* cannot support jurisdiction over maritime torts and that something more is required. Thus, in reviewing commentary, the Court said, "commentators have actively criticized the rule of locality as the *sole* criterion for admiralty jurisdiction, and have recommended adoption of a maritime relationship requirement *as well*." [14] It continued, "this Court has never explicitly held that a maritime locality is the *sole* test of admiralty tort jurisdiction." [15] Then the Court quoted its opinion in *Atlantic Transport Co. v. Imbrovek*, 234 U.S. 52, 34 S.Ct. 733, 58 L.Ed. 1208 (1914):

> Even if it be assumed that the requirement as to locality in tort cases, *while*

U.Fla.L.Rev. 805, 815–17 (1975); *Recent Developments—Admiralty Tort Jurisdiction—Tort Claims Not Within Admiralty Jurisdiction Unless Requisite Maritime Nexus Exists*, 27 Vand. L.Rev. 343 (1974) (conceding maritime locality should at least be factor).

**12.** *Executive Jet, supra*, 409 U.S. at 260, 93 S.Ct. at 500, 34 L.Ed.2d at 462–63 (citing *Gutierrez v. Waterman S.S. Corp.*, 373 U.S. 206, 214–15, 83 S.Ct. 1185, 1190–91, 10 L.Ed.2d 297, 303–04 (1963)). In addition, of course, the Jones Act extends to injuries suffered by a crew member in the course and scope of his employment, even on land. *O'Donnell v. Great Lakes Dredge & Dock Co.*, 318 U.S. 36, 63 S.Ct. 488, 87 L.Ed. 596 (1943); *Vincent v. Harvey Well Serv.*, 441 F.2d 146 (5th Cir. 1971). Such claims are within the admiralty jurisdiction only by virtue of specific congressional extension of that jurisdiction to them. *See O'Donnell, supra*, 318 U.S. at 40–41, 63 S.Ct. at 490–91, 87 L.Ed. at 600–01; *see also Panama R. v. Johnson*, 264 U.S. 375, 386–91, 44 S.Ct. 391, 393–95, 68 L.Ed. 748, 752–54 (1924). The Outer Continental Shelf Lands Act, which we consider more fully below, depends on national sovereignty and the commerce clause; the cause of action it creates is one arising out of a general federal statute, and federal court jurisdiction depends on the existence of a federal question, 28 U.S.C.A. § 1331 (West Supp. 1982), not admiralty. *See, e.g., In re Dearborn Marine Serv., Inc.*, 499 F.2d 263, 270 (5th Cir. 1974).

**13.** *See, e.g., Higginbotham v. Mobil Oil Corp.*, 545 F.2d 422, 424 n.1, 430 (5th Cir. 1977) (stating, on page last cited, "Logic, experience and precedent compel us to reject the argument that airplane crashes ordinarily occur in the absence of default by someone connected with the *design, manufacture, or operation* of the craft") (emphasis added), *rev'd on other grounds*, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978); *Hornsby v. Fish Meal Co.*, 431 F.2d 865, 866–67 (5th Cir. 1970) (pilot error); *Hubschman v. Antilles Airboats, Inc.*, 440 F.Supp. 828, 853–57 (D.V.I.1977) (recovery against lessee and operator of seaplane, plaintiff's employer, allowed under doctrine of *res ipsa loquitur* under circumstances where negligence could only have been land-based); *cf. Roberts v. United States*, 498 F.2d 520, 522–25 (9th Cir.), *cert. denied*, 419 U.S. 1070, 95 S.Ct. 656, 42 L.Ed.2d 665 (1974) (claim in admiralty would have been allowed against United States for alleged negligent direction of landing of decedent's aircraft, which crashed into sea short of runway, but for running of applicable statute of limitations).

**14.** *Executive Jet, supra*, 409 U.S. at 257, 93 S.Ct. at 499, 34 L.Ed.2d at 461 (emphasis added).

**15.** *Id.* at 258, 93 S.Ct. at 499, 34 L.Ed.2d at 461 (emphasis added).

*indispensable,* is not necessarily exclusive, still in the present case the wrong which was the subject of the suit was, we think, of a maritime nature and hence the District Court, from any point of view, had jurisdiction .... If *more* is required than the locality of the wrong in order to give the court jurisdiction, the relation of the wrong to maritime service, to navigation and to commerce on navigable waters, was quite sufficient.[16]

In short, the *Executive Jet* Court expressed concern about "the difficulties involved in trying to apply the locality rule as the *sole test* of admiralty tort jurisdiction,"[17] concluding that "maritime locality *alone* is not a sufficient predicate for admiralty jurisdiction in aviation tort cases."[18] The Court referred to the criterion it was rejecting as the "*locality-alone* test,"[19] and stated, "the mere fact that the alleged wrong 'occurs' or 'is located' on or over navigable waters—whatever that means in an aviation context—is not *of itself* sufficient to turn an airplane negligence case into a 'maritime tort.' It is far more consistent with the history and purpose of admiralty to require *also* that the wrong bear a significant relationship to traditional maritime activity."[20]

After these cases were briefed and argued, the Supreme Court decided that admiralty jurisdiction extends to the collision of two pleasure boats on navigable waters. *Foremost Insurance Co. v. Richardson,* —— U.S. ——, 102 S.Ct. 2654, 2660, 73 L.Ed.2d 300 (1982), aff'g 641 F.2d 314 (5th Cir. 1981). Although it stated, "the *Executive Jet* requirement that the wrong have a significant connection with traditional maritime activity is not limited to the aviation context," —— U.S. at ——, 102 S.Ct. at

2658, the Court quoted our opinion in *Richardson* for the proposition that "admiralty, jurisdiction requires *more* than the occurrence of the tort on navigable waters—. . . *additionally* there must be a significant relationship between the wrong and traditional maritime activity.'" *Id.* at ——, 102 S.Ct. at 2657 (emphasis added) (quoting *Richardson,* 641 F.2d at 315). These comments in both *Executive Jet* and *Richardson* lead ineluctably to the conclusion that maritime locality is still an indispensable element of maritime jurisdiction, an interpretation we have already adopted. *See, e.g., Sohyde Drilling & Marine Co. v. Coastal States Gas Producing Co.,* 644 F.2d 1132, 1135 (5th Cir.), *cert. denied,* —— U.S. ——, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981); *Moser v. Texas Trailer Corp.,* 623 F.2d 1006, 1009, *modified per curiam in other respects,* 630 F.2d 249 (5th Cir. 1981).

■ We conclude, therefore, that, because the *Smith* claim arose from the crash of an aircraft in an inland Louisiana marsh, the district court properly dismissed it for want of maritime jurisdiction.

**B. The *Kolb* Claim**

■ We next turn to the death claim in *Kolb,* which arose out of a helicopter crash on the high seas over the outer Continental Shelf. In this case we consider the meaning of the Court's observation in *Executive Jet* that admiralty jurisdiction is not conferred in aviation cases absent "legislation to the contrary." We conclude that the Court's discussion in *Executive Jet, supra,* 409 U.S. at 274, 93 S.Ct. at 507, 34 L.Ed.2d at 471, of "legislation to the contrary" and its illustration of such legislation by reference to the Death on the High Seas Act, 46 U.S.C.A. §§ 761–768 (West 1975 & Supp.

---

**16.** *Id.* at 258, 93 S.Ct. at 499, 34 L.Ed.2d at 461 (emphasis added) (quoting *Atlantic Transport, supra,* 234 U.S. at 61, 62, 34 S.Ct. at 735, 58 L.Ed. at 1212–13).

**17.** 409 U.S. at 259, 93 S.Ct. at 500, 34 L.Ed.2d at 462 (emphasis added).

**18.** *Id.* at 261, 93 S.Ct. at 501, 34 L.Ed.2d at 463 (emphasis added).

**19.** *Id.* at 265, 93 S.Ct. at 503, 34 L.Ed.2d at 466 (emphasis added).

**20.** *Id.* at 268, 93 S.Ct. at 504, 34 L.Ed.2d at 467 (emphasis added). The Court also repeated its earlier warning in *Victory Carriers, Inc. v. Law,* 404 U.S. 202, 212, 92 S.Ct. 418, 425, 30 L.Ed.2d 383, 391 (1971), that "in determining whether to expand admiralty jurisdiction 'we should proceed with caution ....'" 409 U.S. at 272, 93 S.Ct. at 506, 34 L.Ed.2d at 470.

1982) (DOHSA), indicate that the *Kolb* claim is within the admiralty jurisdiction.

DOHSA, enacted in 1920 to overrule *The Harrisburg*, 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358 (1886), provides a cause of action for "the death of a person ... caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore[s] of ... the United States."[21] While the Act says nothing about the jurisdiction of federal courts, the Court, with apparent approval, noted in *Executive Jet* that federal courts have repeatedly sustained maritime jurisdiction over such cases.[22] As the Court further noted, DOHSA has not been limited by its literal terms to wrongful acts on the high seas but extends to "torts ... with a maritime locality, in that the alleged negligence became operative while the aircraft was on or over navigable waters, and also with some relationship to maritime commerce, at least insofar as the aircraft was beyond state territorial waters and performing a function—transoceanic crossing—that previously would have been performed by waterborne vessels."[23] Thus, the Court concluded on this point: "[U]nder the Death on the High Seas Act, a wrongful-death action arising out of an airplane crash on the high seas beyond a marine league from the shore of a State may clearly be brought in a federal admiralty court."[24]

The *Kolb* death claim, then, could ordinarily be asserted in admiralty simply by virtue of the fact that it arose from an aircraft crash "on the high seas beyond a marine league from the shore of a State." But because Kolb's accident occurred on the outer Continental Shelf, we must determine the effect, if any, of the provisions of the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331–1356 (1976 & Supp. III 1979) (OCSLA).

OCSLA makes the law of adjacent states, to the extent such law is not inconsistent with federal law, applicable as "surrogate" federal law to the subsoil and seabed of the outer Continental Shelf and to the platforms erected thereon.[25] In 1969, the Supreme Court decided, in *Rodrigue v. Aetna Casualty & Surety Co.*, 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969), that accidents occurring on fixed platforms located on the outer Continental Shelf are governed by the OCSLA, which "deliberately eschewed the application of admiralty principles" to platforms; that Act requires the application of state law. 395 U.S. at 355, 365–66, 89 S.Ct. at 1837, 1842, 23 L.Ed.2d at 369–70. While *Rodrigue* deals solely with the body of substantive law applicable to platform-related accidents, not with the jurisdiction of an admiralty court to entertain the action and to apply state law principles, the opinion appears to assume that admiralty jurisdiction entails the gover-

---

**21.** Section 761 reads in pertinent part as follows:

> Whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States, the personal representative of the decedent may maintain a suit for damages in the district courts of the United States, in admiralty . . . ."

46 U.S.C. § 761 (1976).

**22.** *See* cases cited in *Executive Jet, supra*, 409 U.S. at 263 & n.13, 93 S.Ct. at 502 & n.13, 34 L.Ed.2d at 464 & n.13.

**23.** *Executive Jet, supra*, 409 U.S. at 264, 93 S.Ct. at 502, 34 L.Ed.2d at 465.

**24.** *Id.* at 271 n.20, 93 S.Ct. at 506 n.20, 34 L.Ed.2d at 469 n.20.

**25.** 43 U.S.C. § 1333(a) (Supp. III 1979) provides, in relevant part:

> (2)(A) To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf. . . .

nance of admiralty substantive law.[26] In reaching the conclusion that DOHSA did not apply, the Court repeatedly referred to accidents occurring "on" fixed platforms,[27] and, indeed, most cases decided under the *Rodrigue* principle involve an accident which occurred, and an injury which was sustained, "on" the platform.[28] In several cases, however, we have applied OCSLA and, consequently, state law, to incidents in which platform workers who were the victims of torts originating on these artificial islands were not actually injured or killed until they fell, jumped, or were pushed into the surrounding seas.[29] In each of these cases, the injured party was a platform worker and the original impact occurred on the platform.

We have applied OCSLA-dictated state law in only one case in which a platform worker was injured by a tort whose initial impact was not sustained on the platform. In *In re Dearborn Marine Service, Inc.*, 499 F.2d 263 (5th Cir. 1974), *cert. dismissed*, 423 U.S. 886, 96 S.Ct. 163, 46 L.Ed.2d 118 (1975), a platform worker, Monk, was on a "stand-by" vessel tied up seventy-five feet from a platform when an explosion occurred on the platform. With the explosion, a "flaming ball of oil" rose above the platform. Carried by the wind, the ball of fire engulfed the standby vessel, killing all aboard. Monk's heirs sought to maintain a suit against the platform defendants for negligence under the DOHSA and general maritime law. The district court sustained admiralty jurisdiction over these claims. We reversed, concluding that "§ 1333(a)(2) of the [OCSLA], when read against the background of legislative history outlined in *Rodrigue* and the increasing judicial and legislative dissatisfaction with strict locality as the sole test of jurisdiction, precludes us from treating Monk's claim against [the platform defendants] as a suit in admiralty." 499 F.2d at 276.[30]

Texaco and Pool argue that Kolb's claim against them is indistinguishable from Monk's claim against the platform defendants in *Dearborn*, in that in both cases, platform-based negligence had its first impact on the decedent on or over the high

**26.** The Court, for example, observed:

> Thus the *admiralty action* under the Seas Act no more applies to these accidents actually occurring on the islands than it would to accidents occurring in an upland federal enclave or on a natural island to which admiralty *jurisdiction* had not been specifically extended. At a minimum, the legislative history shows that accidents on these structures, which under maritime principles would be no more under *maritime jurisdiction* than accidents on a wharf located above navigable waters, were not changed in character by the Lands Act.

395 U.S. at 366, 89 S.Ct. at 1842, 23 L.Ed.2d at 370 (emphasis added). We, therefore, assume that admiralty jurisdiction is lacking if the substantive law applicable is OCSLA-imposed state law.

**27.** *See, e.g.*, 395 U.S. at 366, 89 S.Ct. at 1842, 23 L.Ed.2d at 370 ("Thus the admiralty action under [DOHSA] no more applies to those accidents *actually occurring on the [artificial] islands* than it would to accidents occurring ... *on* a natural island to which admiralty jurisdiction had not been specifically extended. At a minimum, the legislative history shows that accidents *on* these structures, which under maritime principles would be no more under maritime jurisdiction than accidents on a wharf located above navigable waters, were not

changed in character by the [OCSLA].") (emphasis added).

**28.** *See, e.g., Bonner v. Chevron U.S.A.*, 668 F.2d 817, 818 (5th Cir. 1982); *Alford v. Pool Offshore Co.*, 661 F.2d 43, 44–45 (5th Cir. 1981); *Terry v. Raymond Int'l, Inc.*, 658 F.2d 398, 400, 404–05 (5th Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1975, 72 L.Ed.2d 443 (1982); *Ramos v. Liberty Mut. Ins. Co.*, 615 F.2d 334, 336 & n.1 (5th Cir. 1980), *cert. denied*, 449 U.S. 1112, 101 S.Ct. 921, 66 L.Ed.2d 840 (1981).

**29.** *See, e.g., Oliver v. Aminoil, USA, Inc.*, 662 F.2d 349 (5th Cir. 1981) (per curiam); *Bible v. Chevron Oil Co.*, 460 F.2d 1218 (5th Cir.), *cert. denied*, 409 U.S. 984, 93 S.Ct. 325, 35 L.Ed.2d 248 (1972); *Bertrand v. Forest Corp.*, 441 F.2d 809 (5th Cir.), *cert. denied*, 404 U.S. 863, 92 S.Ct. 106, 30 L.Ed.2d 107 (1971). In *Rodrigue* itself, one of the decedents, Doré, was killed when he fell onto a barge moored next to the platform. *Rodrigue, supra*, 395 U.S. at 353, 89 S.Ct. at 1836, 23 L.Ed.2d at 363.

**30.** However, we sustained Monk's admiralty claims against the owner of the standby vessel, as well as the admiralty claims of the captain and crew members of that vessel against the platform defendants. *See* 499 F.2d at 276, 286.

seas and not on the platform. Although the two situations are alike in that regard, there is a critical difference between Monk's status as a "platform worker" and Kolb's status as the pilot of an aircraft in navigation.

■ The basic thrust of the *Dearborn* opinion holding Monk limited to state law remedies (as against the platform defendants) is that Monk, as a platform worker, was only fortuitously on a vessel at the time of the explosion and that, otherwise, there was virtually nothing to distinguish between him and his fellow platform-workers who perished on the platform.[31] Kolb, by contrast, cannot be considered a "platform worker" under any standard. Instead, his duties constantly carried him back and forth above the high seas over the outer Continental Shelf. Moreover, Kolb's death claim, considered apart from its relationship to the OCSLA,[32] was clearly within admiralty jurisdiction. As we have already noted, the simple fact that Kolb's death occurred as a result of an aircraft crash into the high seas is alone enough to confer jurisdiction under the DOHSA. Even apart from this "special treatment" accorded airplane crash victims, there would still be admiralty jurisdiction over Kolb's accident, as we show below in regard to Petroleum Helicopters' property claim arising from this same accident. *See* Part IIC *infra.* In products liability cases, admiralty jurisdiction has repeatedly been extended to cases in which death or injury occurred on navigable waters even though the wrongful act occurred on land.[33] The place where the negligence or wrongful act occurs is not decisive. The place injury occurs and the function the injured person was performing at the time are more significant. In these respects, the *Kolb* claim is different from Monk's claim in *Dearborn* and similar to the claims of the vessel's captain and crew members in that case. Unlike both Monk and the workers considered in *Rodrigue*, the helicopter pilot was engaged in a maritime-type function, transporting persons over the seas.[34]

**31.** [C]oncerns about the close relationships between *platform workers* and their adjacent states and about the non-maritime character of platform operations indicate to us that Congress did not intend that application of state law necessarily should cease at the physical boundaries of the platform. The same concerns may be equally applicable to accidents fortuitously consummated in the surrounding sea. While Monk's death occurred on the high seas, there is little to choose between his relationship to the adjacent state and those of his *fellow platform workers.* He was by all standards a *platform worker.* The time he spent aboard the [standby ship] was primarily in pursuit of such platform-related duties as filling out work reports and communicating with his shoreside office.
*Dearborn, supra,* 499 F.2d at 273 (emphasis added).

**32.** Cf. *Kimble v. Noble Drilling Corp.,* 416 F.2d 847 (5th Cir. 1969), *cert. denied,* 397 U.S. 918, 90 S.Ct. 924, 25 L.Ed.2d 99 (1970). There, we upheld admiralty jurisdiction over a seaman's injury claim even though the injury was received on a fixed platform.
The Outer Continental Shelf Lands Act *does not oust admiralty law having a basis of applicability independent from the location of the platforms at sea*; indeed, it specifically provides that the general law of the upland state is made the applicable federal law *only to the extent* that it is "not inconsistent with * * * other Federal laws." In *Rodrigue,* the Supreme Court recognized this limitation. It simply reversed a holding that the Death on the High Seas Act applied to workmen on oil platforms at sea because "the Seas Act does not apply of its own force under admiralty principles" to men working on land. The case at bar is distinguishable in that the Jones Act and the general maritime law do apply of their own force here; they would still apply, in fact, even if we assumed that Kimble received his injuries in the heart of the Louisiana mainland, so long as he was acting at the time as a seaman in the service of his ship.
416 F.2d at 850 (first emphasis added).

**33.** See, e.g., *Sperry Rand Corp. v. RCA,* 618 F.2d 319 (5th Cir. 1980); *Pan-Alaska Fisheries, Inc. v. Marine Constr. & Design Co.,* 565 F.2d 1129 (9th Cir. 1977); cf. *Kelly v. Smith,* 485 F.2d 520 (5th Cir. 1973) (admiralty jurisdiction sustained over injury to boaters on the Mississippi River as a result of gunfire ashore), *cert. denied,* 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974).

**34.** See *Ledoux v. Petroleum Helicopters, Inc.,* 609 F.2d 824 (5th Cir. 1980) (per curiam), discussed in Part IIC, *infra.*

We hold, therefore, that admiralty jurisdiction over Kolb's claim against nonemployer third parties[35] is not ousted by section 1333(a) of the OCSLA.

## C. The Property Damage Claim

Petroleum Helicopters' claim for property damage to its helicopter, sustained as a result of the same accident which claimed Kolb's life is patently not affected by DOHSA. In *Executive Jet*, the Supreme Court left open the question of jurisdiction over a tort claim arising in the course of an aircraft's performance of a "function traditionally performed by waterborne vessels."[36] It referred to situations in which such jurisdiction might be arguable: a plane flying from New York to London that crashed in mid-Atlantic[37] and the mid-air collision of two aircraft used in spotting schools of fish resulting in the "crash of those aircraft *into* the Gulf of Mexico *within* one marine league of the Louisiana shore."[38]

The logic of *Executive Jet* appears to require extension of admiralty jurisdiction to nondeath claims arising on the high seas if the aircraft flight has the essential maritime nexus. Not only is the locality-plus criterion met, but judicial economy is also accomplished by submitting claims arising out of the same event to the same forum. While high seas injuries may occur without death, the *Kolb-Petroleum Helicopters* case is not atypical in that both death and property damage claims are presented.

The *Kolb-Petroleum Helicopters* crash had the necessary watery locality. As to the essential maritime nexus, we recently held, in *Ledoux v. Petroleum Helicopters, Inc.*, 609 F.2d 824, 824 (5th Cir. 1980) (per curiam), that the "crash of [a] helicopter, while it [is] being used in place of a vessel to ferry personnel and supplies to and from offshore drilling structures, bears the type of significant relationship to traditional maritime activity which is necessary to invoke admiralty jurisdiction." Therefore, both the locality and maritime nexus requirements being met, we hold that the *Petroleum Helicopters* claim, like the *Kolb* death claim, may be brought in admiralty.

## III.

As we have noted, admiralty jurisdiction for Jones Act purposes, as opposed to admiralty jurisdiction over claims asserted under the general maritime law, extends to injuries sustained on land. *See* note 12 *supra*. In the *Smith* case, claims were asserted under both the Jones Act and the general maritime law, and the district court, somewhat ambiguously, dismissed all "admiralty claims" for want of subject matter jurisdiction. As we have already held, *see* Part IIA, *supra*, it was proper to dismiss the non-Jones Act admiralty claims because of the absence of a "watery locale." Because Jones Act claims may be asserted in admiralty even if the injury occurs on land, it would have been improper to dismiss them on the locality basis. As it appears, however, that the district court dismissed the Jones Act claims, not because of the absence of a maritime locality, but because it believed that Jordan was not a "seaman," *see* Part I *supra*, we deem that "dismissal" as having been on the merits for failure to state a cause of action. Thus viewing the judgment, we agree with the district court's conclusion that Jordan's seaplane was not a "vessel," and that, therefore, Jordan was not a "seaman" entitling his survivors to bring claims under the Jones Act.[39]

---

35. The question of the effect of the OCSLA on an admiralty claim brought against a decedent's employer is pending before the court.

36. *Executive Jet, supra*, 409 U.S. at 271, 93 S.Ct. at 506, 34 L.Ed.2d at 469.

37. *Id.*

38. *Id.* at 271 n. 22, 93 S.Ct. at 506 n.22, 34 L.Ed.2d at 469 n.22 (emphasis added). The

example suggests the necessity of a watery locality, buttressing our conclusion in Part IIA.

39. *See* 46 U.S.C. § 688. Although the Jones Act speaks in terms of "any seaman," it is now universally held that such a "seaman" is equivalent to "the master or a member of the crew of any vessel." *See, e.g., Longmire v. Sea Drilling Corp.*, 610 F.2d 1342, 1345 (5th Cir. 1980).

The Congress that enacted the Jones Act was concerned with overcoming the effects of *The Osceola*, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903), which had denied crew members the right to relief in admiralty for injuries arising from their employer's negligence, while recognizing the traditional unseaworthiness remedy. Congress, following the example of the Federal Employers' Liability Act, 45 U.S.C. §§ 51–60 (1976), enacted a tort remedy limited to members of the crew of a vessel instead of the traditional workers' compensation remedy. It can hardly be thought that, in 1920, Congress intended or believed that the term "vessel" included the primitive aircraft then in use.

We recognize, however, that statutes are not confined in application to contemporary instances and that their principles are to be extended to embrace new factual situations and new technological developments. We have, therefore, held that, for Jones Act purposes, the term "vessel" may include "special purpose structures not usually employed as a means of transport by water, but designed to float on water," even though such structures were not conceived of until long after the Jones Act was adopted. *Offshore Co. v. Robison*, 266 F.2d 769, 779 (5th Cir. 1959).[40] While it cannot be gainsaid that a seaplane is "designed to

float on water," [41] it is clear that *Robison* and many cases following it [42] are concerned with "special purpose structures" employed by the offshore oil drilling industry that are designed to "float" and be towed across water to the drilling site despite their incapacity for *self-propulsion*.

The primary function of a seaplane, by contrast, is transportation through air, not on water.[43] The perils of the air are great but they are different from the dangers of the sea, to which those who work on water are exposed. Thus, we do not find *Robison*'s language, directed to another question, dispositive. Furthermore, when Congress has legislated with seaplanes in mind, it has distinguished them from "vessels." For example, section 1509(a) of Title 49 of the United States Code incorporates a provision of its predecessor, the Air Commerce Act of 1926, to the effect that the navigation and shipping laws of the United States, including any definition of vessels, are not to be construed to apply to seaplanes or other aircraft. 49 U.S.C. § 1509(a) (1976).

Virtually every court confronted with the question has decided that a seaplane is not a vessel, either under the Jones Act or in other contexts. For example, Judge Christian, in a thorough and well-reasoned opin-

---

**40.** *See also* 1 U.S.C. § 3 (1976), which states: The word "vessel" includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water.

Similarly, 46 U.S.C. § 801 (1976) defines the word "vessel" to include:

all water craft and other artificial contrivances of whatever description and at whatever stage of construction, whether on the stocks or launched, which are used or are capable of being or are intended to be used as a means of transportation on water.

As both these statutes derive from enactments occurring prior to the invention of the airplane, it is certain, at least, that the original enacting Congresses did not have airplanes in mind when they defined "vessel."

**41.** But *quaere* whether a seaplane should be thought of as a "special purpose *structure*." *Robison, supra*, 266 F.2d at 779 (emphasis added).

**42.** *See, e.g., Davis v. Hill Eng'g, Inc.*, 549 F.2d 314 (5th Cir. 1977) (derrick barge); *Hicks v. Ocean Drilling & Exploration Co.*, 512 F.2d 817

(5th Cir. 1975) (submersible oil storage facility), *cert. denied*, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 639 (1976); *Neill v. Diamond M. Drilling Co.*, 426 F.2d 487 (5th Cir. 1970) (submersible drilling barge); *Producers Drilling Co. v. Gray*, 361 F.2d 432 (5th Cir. 1966) (same).

**43.** Justice (then Judge) Cardozo explained more than sixty years ago that an airplane designed to land and take off on water:

[I]s, indeed, two things—a seaplane and an aeroplane. To the extent that it is the latter, it is not a vessel, for the medium through which it travels is the air . . .; [t]o the extent it is the former, it is a vessel, for the medium through which it travels is the water . . . .

*Reinhardt v. Newport Flying Service Corp.*, 232 N.Y. 115, 118, 133 N.E. 371, 372 (1921). We need not decide whether a seaplane may ever be considered a "vessel," *e.g.*, if it were in the process of taxiing, taking off or landing *on water* when an accident occurred, for here Jordan collided with a tower erected on land, and the plane crashed on land.

**1114**

ion, decided in *Hubschman* that a seaplane is not a vessel for Jones Act purposes. 440 F.Supp. 828, 852 (D.V.I.1977). In *Wendorff v. State*, 318 Mo. 363, 1 S.W.2d 99 (1977), the Missouri Supreme Court held that a seaplane was an aircraft, not a vessel, within the meaning of a life insurance policy clause excluding coverage for death occurring as the result of an airplane accident. Seaplanes have been held not to be vessels for purposes of the Limitation of Liability Act, 46 U.S.C. §§ 181–196 (1976). *Noakes v. Imperial Airways, Ltd.*, 29 F.Supp. 412 (S.D.N.Y.1939); *Dollins v. Pan-American Grace Airways*, 27 F.Supp. 487 (S.D.N.Y. 1939).[44]

An airplane flying through the ozone does not appear to be a vessel within the meaning of an act addressed to the relief of seamen. The definition is not altered by the fact that the plane is equipped with gear that enables it to begin and end an airborne trip on water.

For these reasons, we conclude that, in *Smith* the Jones Act claim was properly dismissed for its lack of merit. Jones was simply not a seaman or a member of the crew of a vessel.[45]

### IV.

For the reasons given:

(1) The dismissal of Mrs. Smith's suit for want of jurisdiction of the non-Jones Act admiralty claims is AFFIRMED. The dismissal of the Jones Act claim is treated as a dismissal on the merits and, as such, is AFFIRMED.

(2) The dismissal of both Mrs. Kolb's and Petroleum Helicopters's claim for want of jurisdiction is REVERSED.

(3) The Kolb and Petroleum Helicopters cases are REMANDED for further proceedings consistent with this opinion.

---

**44.** *But see Lambros Seaplane Base v. The Batory*, 215 F.2d 228 (2d Cir. 1954) (holding a seaplane to be a vessel within the admiralty jurisdiction for purposes of salvage).

---

**45.** *See Fragumar Corp. v. Dunlap*, 685 F.2d 127 (5th Cir. 1981) (discussing difference between jurisdiction and merits).