850 F.2d 219
 1989 A.M.C. 73, Prod.Liab.Rep.(CCH)P 11,862
 Elaine WATSON, on Behalf of her minor child, Deshanna WATSON
and the Travelers Insurance Co., Plaintiffs-Appellants,
v.
MASSMAN CONSTRUCTION CO., et al., Defendants,
C.V. Harold Rubber Co., Inc. and Dixon Valve & Coupling Co.,
Defendants- Appellees.
 No. 87-3485.
 United States Court of Appeals,
Fifth Circuit.
 July 25, 1988.
 
 Scott E. Silbert, Metairie, La., for Travelers Ins. Co. and Watson.
 J. Daniel Picou, Metairie, La., for C.V. Harold Rubber Co., Inc.
 Mike Pfister, Lawrence J. Duplass, New Orleans, La., for Dixon Valve & Coupling Co.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before BROWN, GEE, and GARWOOD, Circuit Judges.
 JOHN R. BROWN, Circuit Judge:
 
 
 1
 This case comes to us on appeal from an order of the District Court dismissing the suit for lack of admiralty jurisdiction. Because this suit by the survivors of a bridge construction worker who fell to his death in the Mississippi River does not fall within the traditional purview of the admiralty court, we affirm.
 
 
 2
 The Laborer, The Labor in Non-Maritime Work
 
 
 3
 Donald White was a laborer employed by Massman Construction Company. Massman was engaged in constructing the piers for the new Mississippi River Bridge in New Orleans. The employees of Massman were working on work barges as well as on the forms which were used to shape the concrete and steel making up the pier. As the concrete was poured into the forms, the builders used air from compressors on a nearby construction barge to drive a vibrating device to help settle the concrete. The compressors were connected to the vibrators by means of a high pressure compressor hose running from the barge to the pier. The compressor hose was attached to a steel manifold, located on the pier, which then distributed the compressed air to the vibrating device by way of a parallel group of smaller hoses. One of the sections of the high pressure hose[1] failed, and the workers lowered the manifold assembly from the pier to the work barge moored at the base of the pier. A new length of hose was then attached to the manifold.
 
 
 4
 The trouble came when the manifold (with its hoses) and the compressor hose were being hoisted back to the top of the concrete pier. White was assigned the job of grabbing the heavy compressor hose and tying it to the side of the steel forms. Working from the pier, White, without a lifeline, crawled outside a safety railing to reach out to grab the compressor hose. The compressor hose separated from the device coupling it to the manifold, and the heavy coupling and manifold fell, hit White and sent him tumbling into the Mississippi River. He is lost and presumed dead.
 
 Litigation Sets In
 
 5
 White's survivors brought this suit, initially against Massman, alleging violations of various duties under the maritime law by Massman and others. The present appellees, Dixon Valve & Coupling Company and C.V. Harold Rubber Company, added as defendants some time later by way of maritime products liability claims, manufactured and assembled the hose and coupling.[2]
 
 
 6
 Shortly before trial, these defendants moved to dismiss for want of admiralty jurisdiction. The district court granted the motion. We are now asked to review it.
 
 
 7
 "Perverse and Casuistic Borderline Situations": A Reprise
 
 
 8
 of Admiralty Jurisdiction
 
 
 9
 Federal admiralty courts have jurisdiction over a tort dispute if either the injured party or the alleged tortfeasor is a traditional maritime actor, or at least if either of these parties[3] is performing the same function in a traditional maritime activity. Under Executive Jet[4] and Kelly v. Smith,[5] it is clear that maritime locality alone is insufficient to sustain maritime jurisdiction. The wrong must bear a significant relationship to maritime activity.[6]
 
 
 10
 Executive Jet Seagulls Not Causing Seafaring Damage
 
 
 11
 We begin with Executive Jet,[7] which held that admiralty jurisdiction depends on "the relationship of the wrong to traditional maritime activity,"[8] which arises when "the wrong bear[s] a significant relationship to traditional maritime activity."[9] Executive Jet was a suit by an airplane owner against a city and various federal officials for negligently failing to keep seagulls off an airport runway. While the seagulls caused the airplane to crash in navigable waters where it ultimately sank, the Court held there was no federal admiralty jurisdiction over aviation tort claims arising out of flights by land-based aircraft between points within the continental United States.[10]
 
 
 12
 Executive Jet rejected the traditional strict locality test for maritime jurisdiction. The fortuitous circumstance that an injured party or property somehow ended up in navigable waters[11] was simply not sufficient to support admiralty jurisdiction.[12] "It is far more consistent with the history and purpose of admiralty to require also that the wrong bear a significant relationship to traditional maritime activity."[13]
 
 Kelly--Amphibious Warfare
 
 13
 We begin our analysis with a discussion of Kelly, the Fifth Circuit's Plimsoll Line on admiralty jurisdiction. In Kelly, this court found admiralty jurisdiction existed over a ship-to-shore gun battle which occurred in the Mississippi River. The Kellys, poachers, deer hunting without permission, were on an island located in the Mississippi River. They were discovered by the island's caretaker, an active member of the hunting club which held the exclusive license to hunt on the island. As the Kellys attempted to flee the island in their 15-foot boat, shots were exchanged striking Allen Kelly, the man at the tiller, and one of his sons. Both were injured.
 
 
 14
 Under Kelly, the first inquiry is into the functions and roles of the operational actors. In Kelly, the most seriously injured person was the man at the tiller, whom the maritime law would generously characterize as the pilot. His role, like the Master of the S/S QUEEN MARY, was to ensure safe navigation on the river. The craft involved was a boat, whose sole function was transportation on navigable waters. The other instrumentalities involved, the rifles, are not so inherently land-based, nor are the injuries they caused, to preclude any maritime connection. Finally, it did not require any great stretch of traditional maritime law to uphold jurisdiction, because admiralty was traditionally concerned with furnishing remedies for those injured while traveling on navigable waters.[14]
 
 
 15
 The rule of Kelly is simple enough: we must consider (i) "the functions and roles of the parties; (ii) the types of vehicles and instrumentalities involved; (iii) the causation and the type of injury; and (iv) the traditional concepts of the role of admiralty law."[15] But the imprecise fluidity of this "test" is neatly illustrated by the Kelly case itself; Judge Morgan, accepting the majority's test, dissented from their conclusion that admiralty jurisdiction was present!
 
 Not Like Kelly No Maritime Relationship
 
 16
 The case presented here is quite different from Kelly. White was neither a near-pilot nor a seaman. He was a construction worker who fortuitously found himself employed on a construction site in the middle of the Mississippi River. While a work barge was involved, it was so only indirectly and in no way was the barge the cause of the injury. This was neither a collision case or one in which the movement of the barge played any part in the injuries.[16] The injury resulted in part because a coupling failed and partly because White was not wearing a safety line. The coupling was not inherently a maritime instrument.[17] While a safety line is frequently an important, necessary piece of equipment for protection of those exposed to seafaring perils, the exact same accident could have resulted during the construction of the shore-side piers on either of the approaches to the bridge. While drowning is a traditional maritime death, the mere fact that White drowned is insufficient to invoke maritime jurisdiction.[18]
 
 
 17
 Products Liability Cannot A Maritime Case Make
 
 
 18
 The last of the Kelly factors, the traditional concepts of the role of admiralty law, likewise militates against finding jurisdiction. This is a products liability action against the manufacturers of the hose and coupling. This court recognizes that the concept of products liability is available as a basis for recovery in a suit within the admiralty jurisdiction.[19] Indeed, this court, in Sperry Rand Corp. v. Radio Corp. of America,[20] has upheld maritime jurisdiction over a products liability action involving a defective steering mechanism in which damage was caused to, and sustained by, a vessel in navigation. The theory of products liability, however, does not in and of itself provide the requisite element of maritime relatedness for admiralty jurisdiction purposes.
 
 
 19
 While the manufacturing defendant and the defective product in Sperry Rand had little, if anything, to do with maritime commerce, other than the product ending up as an electronic part of a ship's steering apparatus, a vessel engaged in maritime commerce was damaged as a result of collision and subsequent grounding. The injury was not merely to traditional maritime property. The damage occurred in that most classic of salt water, seagoing events--a ship collision. That occurrence met all the tests--pre-and post-Executive Jet-Foremost --for admiralty jurisdiction.
 
 
 20
 The products involved here, a hose and coupling, are not inherently maritime. While the plaintiffs attempt to categorize these products as appurtenances to a vessel (the work barge), it is clear that the manifold to which the hose was attached was located on the pier, not on the barge. While the compressor was situated on the barge, it was not a component part of the vessel as might be a derrick crane, or moveable crane on the deck of a barge.[21] The work barge served essentially as a convenient platform, much like a scaffolding on land.[22] This case is distinguishable from Sperry Rand in that the injury was not to a vessel in commerce. This might be a different case had the failed coupling in some way resulted in the work barge being destroyed. The vessel, however, was not damaged. The injury was not to a vessel in navigation but to a landbased construction worker, then engaged in working on a pier attached permanently to the land,[23] who fortuitously drowned in navigable waters.
 
 
 21
 The facts here are much closer to Molett v. Penrod Drilling Co.,[24] where two workers finishing a jack-up rig on a floating barge were killed when the chain supporting a "gin pole" portable crane snapped. Admiralty jurisdiction was denied over a products liability suit against the manufacturer and seller of the chain. Molett emphasized the non-maritime nature of the workers, the product, and the injury, emphasizing that nothing about the case implicated the core concerns of admiralty. The Molett court equated the fourth prong of Kelly, "traditional concepts of the role of admiralty law," with the following words from Executive Jet:
 
 
 22
 [Admiralty] law deals with navigational rules--rules that govern the manner and direction those vessels may rightly move upon the waters. When a collision occurs or a ship founders at sea, the law of admiralty looks to those rules to determine fault, liability, and all other questions that may arise from such a catastrophe. Through long experience, the law of the sea knows how to determine whether a particular ship is seaworthy, and it knows the nature of maintenance and cure. It is concerned with maritime liens, the general average, captures and prizes, limitation of liability, cargo damage, and claims for salvage.[25]
 
 
 23
 The injured workers in Molett were rig builders, not seamen, and not doing things seamen traditionally do. The tortfeasors were manufacturers whose products were sold mainly to landlubbers. The fact that the accident actually occurred on a vessel was not enough in the court's view to give rise to admiralty jurisdiction over this products liability claim against non-vessel defendants.
 
 
 24
 Donald White was a land-based worker who was not doing seaman's work. The alleged tortfeasors are product manufacturers whose contact with the maritime activity is remote and casual. Given the location, nature and manner of performance of the work and utilization of the equipment, the defective hose and coupling were not appurtnances of the vessel (the construction barge), or were so only in an attenuated sense and to a limited extent. Under the circumstances, the relationship of the hose and coupling to the barge was simply insufficient to establish that this claim has the requisite maritime nexus for admiralty jurisdiction.[26]
 
 
 25
 The maritime locality was a mere fortuity. Locality is no longer enough; locality is all Donald White had. The District Court correctly denied admiralty jurisdiction.
 
 The Effect of the Longshoreman's Act
 
 26
 The plaintiffs assert that recovery should be allowed under the Longshoreman and Harbor Workers Compensation Act. They point to several cases where workers performing non-maritime functions have nevertheless recovered under the LHWCA. The problem with this argument is that the plaintiffs were unsuccessful in their administrative attempts to receive benefits under the LHWCA. As this is not an appeal from a denial of benefits, we do not have jurisdiction to resolve the question of whether Donald White was covered by the LHWCA.[27] To obtain relief on this theory, White's survivors must first comply with the statutory administrative scheme and appellate review.
 
 
 27
 AFFIRMED.
 
 
 
 [1]
 The section between the compressor and the manifold
 
 
 [2]
 The plaintiffs and Massman's insurance company entered into a Mary Carter agreement, so that the insurance company, now in the attractive garb of a more appealing plaintiff, is now aligned as a plaintiff and has a right to some of the proceeds from a settlement or judgment against the remaining defendants/appellees
 
 
 [3]
 The persons or entities involved in the tort itself, not the "parties" in the legal sense of the word
 
 
 [4]
 Executive Jet Aviation v. City of Cleveland, 409 U.S. 249, 255, 93 S.Ct. 493, 498, 34 L.Ed.2d 454, 1973 A.M.C. 1 (1972)
 
 
 [5]
 485 F.2d 520, 525, 1973 A.M.C. 2478 (5th Cir.1973), cert. denied, Chicot Land Co. v. Kelly, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974)
 
 
 [6]
 Kelly, 485 F.2d at 524
 
 
 [7]
 See n. 3, supra
 
 
 [8]
 409 U.S. at 261, 93 S.Ct. at 501, 34 L.Ed.2d at 463
 
 
 [9]
 409 U.S. at 268, 93 S.Ct. at 504, 34 L.Ed.2d at 467
 
 
 [10]
 409 U.S. at 274, 93 S.Ct. at 507, 34 L.Ed.2d at 471
 
 
 [11]
 This fortuity has led to the development of often subtle nuances in the determination of whether a particular claim, or part of a claim, may be characterized as maritime. Compare Smith v. Pan Air Corp., 684 F.2d 1102 (5th Cir.1982) (holding the loss of a helicopter in the Gulf of Mexico within the admiralty jurisdiction) with Barger v. Petroleum Helicopters, Inc., 692 F.2d 337 (5th Cir.1982) (holding maritime claims did not lie for death of a helicopter pilot killed while transporting oil field workers to platforms in the Gulf of Mexico)
 
 
 [12]
 The anomaly that would result from using locality alone is illustrated by Executive Jet. Had the plane crashed less than a half mile earlier, there would have been no question of invoking the admiralty jurisdiction. The locality test also proves difficult to apply, as it is not always clear where the tort, that is, the wrong, has occurred. Was the Executive Jet tort land based, where the gulls were ingested? Or water based, where the plane crashed?
 
 
 [13]
 409 U.S. at 268, 93 S.Ct. at 504, 34 L.Ed.2d at 467
 
 
 [14]
 485 F.2d at 525-26
 
 
 [15]
 485 F.2d at 525-26
 
 
 [16]
 Cf. Foremost Ins. Co. v. Richardson, 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982) (collision between two pleasure crafts in navigable waters within admiralty jurisdiction)
 
 
 [17]
 Unlike Louisville & Nashville RR. Co. v. M/V BAYOU LACOMBE, 597 F.2d 469 (5th Cir.1979) where admiralty jurisdiction was allowed over a suit by railroad company for the loss of use of a bridge struck by a vessel. The claimed injury was the result of a bridge being hit by a vessel in navigation. White's death cannot be attributed to any operational fault of a vessel. His accident was the result of a failed coupling which was not a vessel appurtenance
 
 
 [18]
 See T. Smith & Son v. Taylor, 276 U.S. 179, 48 S.Ct. 228, 72 L.Ed. 520 (1928); L'Hote v. Crowell, 54 F.2d 212 (5th Cir.1931)
 
 
 [19]
 Lewis v. Timco, 716 F.2d 1425, 1984 A.M.C. 191 (5th Cir.1983) (en banc)
 
 
 [20]
 618 F.2d 319 (5th Cir.1980)
 
 
 [21]
 See Kinsella v. Zim Israel Navigation Co., 513 F.2d 701, 703-04 (1st Cir.1975) (discussing concept of an "appurtenance" to a ship in the context of an unseaworthiness claim by a longshoreman)
 
 
 [22]
 In Shows v. Harber, 575 F.2d 1253 (8th Cir.1978), the Eighth Circuit found no admiralty jurisdiction over a suit by the widow of a bridge worker who drowned after the scaffold from which he was painting gave way
 
 
 [23]
 Victory Carriers, Inc. v. Law, 404 U.S. 202, 206-07, 92 S.Ct. 418, 422, 30 L.Ed.2d 383, 388 (1971); Nacirema Operating Co. v. Johnson, 396 U.S. 212, 214-15, 90 S.Ct. 347, 349, 24 L.Ed.2d 371, 374-75 (1969); Parker v. South Louisiana Contractors, Inc., 537 F.2d 113, 115 (5th Cir.1976), cert. denied, 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 582 (1977)
 
 
 [24]
 826 F.2d 1419 (5th Cir.1987)
 
 
 [25]
 Executive Jet, 409 U.S. at 270, 93 S.Ct. at 505, 34 L.Ed.2d at 468
 
 
 [26]
 This court has often grappled with the problem that no definitive standard exists for defining maritime flavor. See Molett, 826 F.2d at 1419
 
 
 [27]
 Unlike Pippen v. Shell Oil Co., 661 F.2d 378 (5th Cir.1981) and Boudreaux v. American Workover, Inc., 680 F.2d 1034 (5th Cir.1982), where the issue in a court-based maritime damage suit involved the question of the right of indemnity under the LHWCA, neither the District Court nor this Court has any jurisdiction over a proposed claim under the LHWCA